# PAULSEN ET UX. *v.* COMMISSIONER OF INTERNAL REVENUE

No. 83–832.   Argued October 29, 1984—Decided January 8, 1985

REHNQUIST, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 144. POWELL, J., took no part in the decision of the case.

*William R. Nicholas* argued the cause for petitioners. With him on the briefs was *Karen S. Bryan.*

*Albert G. Lauber, Jr.*, argued the cause for respondent. With him on the brief were *Solicitor General Lee, Acting Assistant Attorney General Olsen*, and *Ernest J. Brown.**

JUSTICE REHNQUIST delivered the opinion of the Court.

Commerce Savings and Loan Association of Tacoma, Wash., merged into Citizens Federal Savings and Loan Association of Seattle in July 1976. Petitioners Harold and Marie Paulsen sought to treat their exchange of stock in Commerce for an interest in Citizens as a tax-free reorganization under 26 U. S. C. §§ 354(a)(1) and 368(a)(1)(A). The Court of Appeals for the Ninth Circuit, disagreeing with the Court of

---

*Aaron M. Peck* and *Martin S. Schwartz* filed a brief for the California League of Savings Institutions as *amicus curiae* urging reversal.

Claims and other Courts of Appeals,* reversed a decision of the Tax Court in favor of petitioners. 716 F. 2d 563 (1983). We granted certiorari, 465 U. S. 1021 (1984), to resolve these conflicting interpretations of an important provision of the Internal Revenue Code.

At the time of the merger, petitioner Harold T. Paulsen was president and a director of Commerce. He and his wife, petitioner Marie B. Paulsen, held as community property 17,459 shares of "guaranty stock" in Commerce. In exchange for this stock petitioners received passbook savings accounts and time certificates of deposit in Citizens. Relying on 26 U. S. C. §§ 354(a)(1) and 368(a)(1)(A), they did not report the gain they realized on their 1976 federal income tax return because they considered the merger to be a tax-free reorganization.

Before it ceased to exist, Commerce was a state-chartered savings and loan association incorporated and operated under Washington State law. It was authorized to issue "guaranty stock," to offer various classes of savings accounts, and to make loans. Each stockholder, savings account holder, and borrower was a member of the association. Each share of stock and every $100, or fraction thereof, on deposit in a savings account carried with it one vote. Each borrower also had one vote.

The "guaranty stock" had all of the characteristics normally associated with common stock issued by a corporation. Under the bylaws, a certain amount of guaranty stock was required to be maintained as the fixed and nonwithdrawable capital of Commerce. In accordance with Wash. Rev. Code Ann. § 33.48.080 (Supp. 1981), holders of guaranty stock, but no other members, had a proportionate proprietary interest in its assets and net earnings, subordinate to the claims of

---

*Capital Savings and Loan Assn. v. United States, 221 Ct. Cl. 557, 607 F. 2d 970 (1979); West Side Federal Savings and Loan Assn. v. United States, 494 F. 2d 404 (CA6 1974); Everett v. United States, 448 F. 2d 357 (CA10 1971).

creditors. Dividends could not be declared or paid on the guaranty stock unless certain reserves had been accumulated and dividends had been declared and paid on withdrawable savings accounts.

Citizens is a federally chartered mutual savings and loan association under the jurisdiction of the Federal Home Loan Bank Board. 12 U. S. C. § 1461 *et seq.* It offers savings accounts and makes loans, but has no capital stock. Its members are its depositors and borrowers. Each savings account holder has one vote for each $100, or fraction thereof, of the withdrawal value of his savings account up to a maximum of 400 votes. Each borrower has one vote.

Citizens is owned by its depositors. Twice each year its net earnings and any surplus are to be distributed to its savings account holders pro rata to the amounts on deposit. Its net assets would similarly be distributed if liquidation or dissolution should occur. It is obligated to pay written withdrawal requests within 30 days, and may redeem any of its accounts at any time by paying the holder the withdrawal value.

The merger was effected pursuant to a "Plan of Merger," under which Commerce's stockholders exchanged all their stock for passbook savings accounts and certificates of deposit in Citizens. The plan was designed to conform to the requirements of Wash. Rev. Code § 33.40.010 (1983), which provides for mergers between business entities, and to qualify as a tax-free reorganization under the terms of §§ 354(a)(1) and 368(a)(1)(A). Under the plan, Commerce stockholders received for each share a $12 deposit in a Citizens passbook savings account, subject only to the restriction that such deposits could not be withdrawn for one year. They also had the alternative of receiving time certificates of deposit in Citizens with maturities ranging from 1 to 10 years at the same $12-per-share exchange rate. The plan further provided that former Commerce stockholders could borrow against their deposits resulting from the exchange at 1.5%

above the passbook rate as opposed to a 2% differential for other depositors. Following the exchange, the merged entity continued to operate under the Citizens name.

Petitioners had a cost basis in their Commerce stock of $56,802; in the exchange they received passbook accounts and certificates of deposit worth $209,508. In 1976, 26 U. S. C. § 1002 (1970 ed.) required that "on the sale or exchange of property the entire amount of the gain or loss . . . shall be recognized." Accordingly, petitioners were required to declare as income on their 1976 return the $152,706 profit unless one of the exceptions incorporated by reference in § 1002 applied.

Included among the exceptions to § 1002 were the corporate reorganization provisions set out in §§ 354 to 368. As already noted, petitioners have attempted to rely on § 354(a)(1), which provides:

> "No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

Section 368(a)(1)(A) defines a "reorganization" to include "a statutory merger or consolidation," and §§ 7701(a)(3), 7701(a)(7), and 7701(a)(8) further define the terms "corporation" to include "associations," "stock" to include "shares in an association," and "shareholder" to include a "member in an association." There is no dispute that at the time of the merger Commerce and Citizens qualified as associations, petitioners qualified as shareholders, Commerce's guaranty stock and Citizens' passbook accounts and certificates of deposit qualified as stock, and the merger qualified as a statutory merger within these provisions of the Code. Accordingly, under the literal terms of the Code the transaction would qualify as a tax-free "reorganization" exchange rather

than a sale or exchange on which gain must be recognized and taxes paid.

Satisfying the literal terms of the reorganization provisions, however, is not sufficient to qualify for nonrecognition of gain or loss. The purpose of these provisions is "'to free from the imposition of an income tax purely "paper profits or losses" wherein there is no realization of gain or loss in the business sense but merely the recasting of the same interests in a different form.'" *Southwest Natural Gas Co.* v. *Commissioner*, 189 F. 2d 332, 334 (CA5), cert. denied, 342 U. S. 860 (1951) (quoting *Commissioner* v. *Gilmore's Estate*, 130 F. 2d 791, 794 (CA3 1942)). See Treas. Reg. § 1.368–1(b), 26 CFR § 1.368–1(b) (1984). In order to exclude sales structured to satisfy the literal terms of the reorganization provisions but not their purpose, this Court has construed the statute to also require that the taxpayer's ownership interest in the prior organization must continue in a meaningful fashion in the reorganized enterprise. *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462, 468–470 (1933). In that case we held that "the seller must acquire an interest in the affairs of the purchasing company more definite than that incident to ownership of its short-term purchase-money notes." *Id.*, at 470. We soon added the requirement that "this interest must be definite and material; it must represent a substantial part of the value of the thing transferred." *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378, 385 (1935). Compare *LeTulle* v. *Scofield*, 308 U. S. 415, 420–421 (1940) (no retained property interest where transferor received transferee's bonds), with *John A. Nelson Co.* v. *Helvering*, 296 U. S. 374, 377 (1935) (continuity of interest satisfied where nonvoting preferred stock received). Known as the "continuity-of-interest" doctrine, this requirement has been codified in Treas. Regs. §§ 1.368–1(b), 1.368–2(a).

The present case turns on whether petitioners' exchange of their guaranty stock in Commerce for their passbook savings

accounts and certificates of deposit in Citizens satisfies this continuity-of-interest requirement. More generally, we must decide whether a merger of a stock savings and loan association into a mutual savings and loan association qualifies as a tax-free reorganization. Following his ruling in Rev. Rul. 69–6, 1969–1 Cum. Bull. 104, which itself apparently was at odds with his earlier policy expressed in Rev. Rul. 54–624, 1954–2 Cum. Bull. 16, the Commissioner rejected petitioners' treatment of the Commerce-Citizens merger as a tax-free reorganization under §§ 354(a)(1) and 368(a)(1)(A) and issued a statutory notice of deficiency finding petitioners liable for tax on their entire $152,706 gain.

Petitioners sought redetermination of the deficiency in the Tax Court, which found that the Commissioner's position had been uniformly rejected by the courts. Following *Capital Savings and Loan Assn.* v. *United States*, 221 Ct. Cl. 557, 607 F. 2d 970 (1979); *West Side Federal Savings and Loan Assn.* v. *United States*, 494 F. 2d 404 (CA6 1974); *Everett* v. *United States*, 448 F. 2d 357 (CA10 1971), the Tax Court reasoned that the savings accounts and certificates of deposit were the only forms of equity in Citizens, and it held that the requisite continuity of interest existed. 78 T. C. 291 (1982).

The Commissioner appealed to the Court of Appeals for the Ninth Circuit, which declined to follow the cases cited by the Tax Court and reversed. 716 F. 2d 563 (1983). It reasoned that "despite certain formal equity characteristics" the passbook savings accounts and time certificates of deposit "are in reality indistinguishable from ordinary savings accounts and are essentially the equivalent of cash." *Id.*, at 569. For the reasons that follow we affirm the decision of the Court of Appeals.

Citizens is organized pursuant to Charter K (Rev.), 12 CFR § 544.1(b) (as of July 1, 1976), which provides for raising capital "by accepting payments on savings accounts representing share interests in the association." These shares are

the association's only means of raising capital. Here they are divided into passbook accounts and certificates of deposit. In reality, these shares are hybrid instruments having both equity and debt characteristics. They combine in one instrument the separate characteristics of the guaranty stock and the savings accounts of stock associations like Commerce.

The Citizens shares have several equity characteristics. The most important is the fact that they are the only ownership instrument of the association. Each share carries in addition to its deposit value a part ownership interest in the bricks and mortar, the goodwill, and all the other assets of Citizens. Another equity characteristic is the right to vote on matters for which the association's management must obtain shareholder approval. The shareholders also receive dividends rather than interest on their accounts; the dividends are paid out of net earnings, and the shareholders have no legal right to have a dividend declared or to have a fixed return on their investment. The shareholders further have a right to a pro rata distribution of any remaining assets after a solvent dissolution.

These equity characteristics, however, are not as substantial as they appear on the surface. Unlike a stock association where the ownership of the assets is concentrated in the stockholders, the ownership interests here are spread over all of the depositors. The equity interest of each shareholder in relation to the total value of the share, therefore, is that much smaller than in a stock association. The right to vote is also not very significant. A shareholder is limited to 400 votes; thus any funds deposited in excess of $40,000 do not confer any additional votes. The vote is also diluted each time a loan is made, as each borrower is entitled to one vote. In addition the Commissioner asserts, and petitioners do not contest, that in practice, when depositors open their accounts, they usually sign proxies giving management their votes.

The fact that dividends rather than interest are paid is by no means controlling. Petitioners have not disputed the

Commissioner's assertion that in practice Citizens pays a fixed, preannounced rate on all accounts. As the Court of Appeals observed, Citizens would not be able to compete with stock savings and loan associations and commercial banks if it did not follow this practice. Potential depositors are motivated only by the rate of return on their accounts and the security of their deposits. In this latter respect, the Citizens accounts are insured by the Federal Savings and Loan Insurance Corporation (FSLIC), up to $40,000 in 1976 and now up to $100,000. 12 U. S. C. § 1728(a). The Code treats these dividends just like interest on bank accounts rather than like dividends on stock in a corporation. The dividends are deductible to Citizens, 26 U. S. C. § 591, and they do not qualify for dividend exclusion by the Citizens shareholders under § 116.

The right to participate in the net proceeds of a solvent liquidation is also not a significant part of the value of the shares. Referring to the possibility of a solvent liquidation of a mutual savings association, this Court observed: "It stretches the imagination very far to attribute any real value to such a remote contingency, and when coupled with the fact that it represents nothing which the depositor can readily transfer, any theoretical value reduces almost to the vanishing point." *Society for Savings* v. *Bowers*, 349 U. S. 143, 150 (1955).

In contrast, there are substantial debt characteristics to the Citizens shares that predominate. Petitioners' passbook accounts and certificates of deposit are not subordinated to the claims of creditors, and their deposits are not considered permanent contributions to capital. Shareholders have a right on 30 days' notice to withdraw their deposits, which right Citizens is obligated to respect. While petitioners were unable to withdraw their funds for one year following the merger, this restriction can be viewed as akin to a delayed payment rather than a material alteration in the nature of the instruments received as payment. In this case petitioners were immediately able to borrow against their

deposits at a more favorable rate than Citizens' depositors generally. As noted above, petitioners were also in effect guaranteed a fixed, preannounced rate of return on their deposits competitive with stock savings and loan associations and commercial banks.

In our view, the debt characteristics of Citizens' shares greatly outweigh the equity characteristics. The face value of petitioners' passbook accounts and certificates of deposit was $210,000. Petitioners have stipulated that they had a right to withdraw the face amount of the deposits in cash, on demand after one year or at stated intervals thereafter. Their investment was virtually risk free and the dividends received were equivalent to prevailing interest rates for savings accounts in other types of savings institutions. The debt value of the shares was the same as the face value, $210,000; because no one would pay more than this for the shares, the incremental value attributable to the equity features was, practically, zero. Accordingly, we hold that petitioners' passbook accounts and certificates of deposit were cash equivalents.

Petitioners have failed to satisfy the continuity-of-interest requirement to qualify for a tax-free reorganization. In exchange for their guaranty stock in Commerce, they received essentially cash with an insubstantial equity interest. Under *Minnesota Tea Co.*, their equity interest in Citizens would have to be "a substantial part of the value of the thing transferred." 296 U. S., at 385. Assuming an arm's-length transaction in which what petitioners gave up and what they received were of equivalent worth, their Commerce stock was worth $210,000 in withdrawable deposits and an unquantifiably small incremental equity interest. This retained equity interest in the reorganized enterprise, therefore, is not a "substantial" part of the value of the Commerce stock which was given up. We agree with the Commissioner that the equity interests attached to the Citizens shares are too insubstantial to satisfy *Minnesota Tea Co.* The Citizens shares are not significantly different from the notes that this

Court found to be the mere "equivalent of cash" in *Pinellas & Cold Storage Ice Co.*, 287 U. S., at 468–469. The ownership interest of the Citizens shareholders is closer to that of the secured bondholders in *LeTulle* v. *Scofield*, 308 U. S., at 420–421, than to that of the preferred stockholders in *John A. Nelson Co.* v. *Helvering*, 296 U. S., at 377. The latter case involved a classic ownership instrument—preferred stock carrying voting rights only in the event of a dividend default—which we held to represent "a definite and substantial interest in the affairs of the purchasing corporation." *Ibid.*

Petitioners argue that the decision below erroneously turned on the relative change in the nature and extent of the equity interest, contrary to the holding in *Minnesota Tea Co.* that "the relationship of the taxpayer to the assets conveyed [could] substantially chang[e]," and only a "material part of the value of the transferred assets" need be retained as an equity interest. 296 U. S., at 386. In that case, taxpayers received voting trust certificates representing $540,000 of common stock and $425,000 cash; 56% of the value of the assets given up was retained as an equity interest in the transferee. In *John A. Nelson Co.*, *supra*, the taxpayer received consideration consisting of 38% preferred stock and 62% cash. Here, in contrast, the retained equity interest had almost no value. It did not amount to a "material part" of the value of the Commerce stock formerly held by petitioners. See *Southwest Natural Gas Co.* v. *Commissioner*, 189 F. 2d, at 335 (insufficient continuity of interest where stock received represented less than 1% of the consideration).

Petitioners' real complaint seems to be our willingness to consider the equity and debt aspects of their shares separately. Clearly, if these interests were represented by separate pieces of paper—savings accounts on the one hand and equity instruments of some kind on the other—the value of the latter would be so small that we would not find a continuity of proprietary interest. In order not "to exalt artifice above reality and to deprive the statutory provision

in question of all serious purpose," *Gregory* v. *Helvering*, 293 U. S. 465, 469–470 (1935), it is necessary in the present case to consider the debt and equity aspects of a single instrument separately. See Rev. Rul. 69–265, 1969–1 Cum. Bull. 109, 109–110, which treats the conversion rights incorporated in convertible preferred stock as "property other than voting stock" for purposes of § 368(a)(1)(C).

Petitioners also complain that the result reached by the court below is inconsistent with the Commissioner's position that a merger of one mutual savings and loan institution into another mutual association or into a stock association would still qualify as a tax-free reorganization. See Rev. Rul. 69–3, 1969–1 Cum. Bull. 103. If the continuity-of-interest test turns on the nature of the thing received, and not on the relative change in proprietary interest, argue petitioners, the interest received in the merger of two mutual associations is no different from the interest received in the instant case.

As already indicated, shares in a mutual association have a predominant cash-equivalent component and an insubstantial equity component. When two mutual associations merge, the shares received are essentially identical to the shares given up. As long as the cash value of the shares on each side of the exchange is the same, the equity interest represented by the shares received—though small—is equivalent to the equity interest represented by the shares given up. Therefore, to the extent that a mutual association share reflects an equity interest, the continuity-of-interest requirement, as defined in *Minnesota Tea Co.*, is satisfied in an exchange of this kind. The fact that identical cash deposits are also exchanged does not affect the equity aspect of the exchange. In the case of a merger of a mutual association into a stock association, the continuity-of-interest requirement is even more clearly satisfied because the equity position of the exchanging shareholders is not only equivalent before and after the exchange, but it is enhanced.

Finally, petitioners argue that the characterization of their mutual association shares as debt conflicts with this Court's decision in *Tcherepnin* v. *Knight*, 389 U. S. 332 (1967), holding that a withdrawable mutual association share indistinguishable from Citizens' shares was a "security" within the meaning of §3(a)(10) of the Securities Exchange Act of 1934. Cf. *Marine Bank* v. *Weaver*, 455 U. S. 551, 557 (1982) (distinguishing *Tcherepnin* because the withdrawable capital shares there did not pay a fixed rate of return and "were much more like ordinary shares of stock and 'the ordinary concept of a security' . . . than a certificate of deposit" [in a bank]); *Wisconsin Bankers Assn.* v. *Robertson*, 111 U. S. App. D. C. 85, 294 F. 2d 714, 717 (Burger, J., concurring), cert. denied, 368 U. S. 938 (1961). The purpose of the Securities Acts is different from the purpose of the Tax Code. The focus in *Tcherepnin* was on the investment character of the shares, specifically whether they satisfied the test in *SEC* v. *W. J. Howey Co.*, 328 U. S. 293, 301 (1946), for an investment contract, namely the "investment of money in a common enterprise with profits to come solely from the efforts of others." Unlike the instant case, there is no requirement that the investors have a substantial proprietary interest in the enterprise. Moreover, in *Howey* as in this case, we disregarded the formal terms of the instruments in question and looked to their economic substance. Any remaining tension between the instant decision and *Tcherepnin* and *Weaver* can be explained by the fact that this Court has in cases such as *Tcherepnin* liberally construed the definition of "security" in the Securities Acts, while such liberality is not warranted in construing the scope of the reorganization provisions.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE POWELL took no part in the decision of the case.

144

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE joins, dissenting.

Today the Court holds that the merger of a stock savings and loan association into a mutual savings and loan association does not qualify as a tax-deferred reorganization under § 368(a)(1)(A) of the Internal Revenue Code. Although the merger meets all the statutory requirements, and although all courts that considered similar transactions before this case found they qualified as tax-deferred reorganizations, see *ante*, at 132–133, and n., the Court nevertheless concludes that such a merger fails to qualify under a refined interpretation of the judicially imposed "continuity-of-interest" doctrine. This holding introduces an unfortunate and unnecessary element of uncertainty into an area of our income tax laws where clear and consistent precedent is particularly helpful to both taxpayers and tax collectors. Because I find the Court's holding unwise as a matter of policy and unwarranted as a matter of law, I respectfully dissent.

The Court concedes that the merger of Commerce Savings and Loan Association of Tacoma, Wash. (Commerce), into Citizens Federal Savings and Loan Association of Seattle (Citizens) met the literal terms of the Internal Revenue Code to qualify the merger for treatment as a tax-deferred reorganization. *Ante*, at 135. Indeed, the merger between Commerce and Citizens satisfies the statutory definition of a reorganization in § 368(a)(1)(A), and the Citizens mutual share accounts meet the statutory definition of stock in § 7701(a)(7). Nevertheless, the Court refuses to accord the merger the benefits of § 368(a)(1)(A) because of the "continuity-of-interest" requirement as currently codified in Treas. Regs. §§ 1.368–1(b) and 1.368–2(a), 26 CFR §§ 1.368–1(b) and 1.368–2(a) (1984). *Ante*, at 136. The Treasury Regulations, codifying the requirements of this Court's decisions in *Gregory* v. *Helvering*, 293 U. S. 465 (1935), and *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462 (1933), provide tax-deferred status for the acquiring corporation when it continues the business of

the acquired corporation or utilizes a substantial part of its assets. Treas. Regs. §§ 1.368–1(b) and (d)(2), 26 CFR §§ 1.368–1(b) and (d)(2) (1984). Similarly, the shareholders of the acquired corporation need not immediately recognize any gain from the transaction as long as they retain a continuing proprietary interest in the surviving corporation. *Ibid.*

Here, all concede that Citizens continued the business of Commerce after the merger. The sole issue is whether the Commerce stockholders retained a continuing proprietary interest when they received mutual share accounts in Citizens in exchange for their Commerce guaranty stock. The Court concludes that they did not.

The continuity-of-proprietary-interest doctrine "was born of a judicial effort to confine the reorganization provisions to their proper function." B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 14.11 (4th ed. 1979). The cases establish that the owners of an acquired corporation must immediately recognize any gain from a merger unless they receive an equity interest in the surviving business that represents a substantial part of the value of the property transferred. *Pinellas Ice & Cold Storage Co.* v. *Commissioner, supra,* the first relevant authority of this Court, established that receipt of short-term promissory notes were not securities for purposes of a reorganization. The Court stated that "the seller must acquire an interest in the affairs of the purchasing company more definite than that incident to ownership of its short-term purchase-money notes" to qualify as a reorganization. *Id.,* at 470. Three Terms later, in *Helvering* v. *Minnesota Tea Co.,* 296 U. S. 378 (1935), the Court upheld as a reorganization the transfer of the corporate assets in exchange for voting trust certificates representing common stock plus almost an equal amount of cash. The Court there said:

> "[The] interest must be definite and material; it must represent a substantial part of the value of the thing transferred. . . .
>
> .    .    .    .    .

"The transaction here was no sale, but partook of the nature of a reorganization in that the seller acquired a definite and substantial interest in the purchaser.

"True it is that the relationship of the taxpayer to the assets conveyed was substantially changed, but this is not inhibited by the statute. Also, a large part of the consideration was cash. This, we think, is permissible so long as the taxpayer received an interest in the affairs of the transferee which represented a material part of the value of the transferred assets." *Id.*, at 385–386.

Shareholders maintained a sufficient continuity of proprietary interest when corporate assets were exchanged for 38 percent nonvoting and redeemable preferred stock and 62 percent cash. *John A. Nelson Co.* v. *Helvering*, 296 U. S. 374 (1935). But consideration consisting wholly of the transferee's bonds was held to make the bondholders merely creditors rather than proprietary owners of the business. *LeTulle* v. *Scofield*, 308 U. S. 415 (1940).

Against this background, the Court concludes that the equity interest represented in the share accounts of a mutual savings and loan is so insubstantial that shareholders who receive such accounts do not retain a sufficient proprietary interest in the enterprise. The basis of the Court's holding is a characterization of the mutual share accounts as "hybrid instruments" having both equity and debt characteristics, *ante*, at 138. The Court finds that the debt characteristics outweigh the equity characteristics, *ante*, at 140, and concludes that the equity interest received does not represent "a substantial part of the value of the thing transferred." *Helvering* v. *Minnesota Tea Co.*, *supra*, at 385.

I agree that a mutual share account is a hybrid security, and that it has substantial debt characteristics. The opportunity to withdraw from the account after one year cloaks the account holder with some of the attributes of a creditor, and the account with some of the attributes of debt. I neverthe-

less believe that the equity interest represented in a mutual share account is substantial, and thus satisfies the continuity-of-proprietary-interest requirement.

The taxpayers in this case received mutual share accounts and certificates of deposit from Citizens which gave them the same proprietary features of equity ownership which they previously had as stockholders in Commerce, plus the right after a stated interval to withdraw their cash deposits. As the Court recognizes, the guaranty stockholders of Commerce were the equitable owners of the corporation and had a proportionate proprietary interest in the corporation's assets and net earnings. *Ante*, at 133–134. When they exchanged their shares for deposits in Citizens, they became the equitable owners of the mutual association. As equitable owners, the mutual share account holders retained all the relevant rights of corporate stockholders: the right to vote, the right to share in net assets on liquidation, and the right to share in the earnings and profits of the enterprise. Indeed, the proprietary interest obtained by petitioners here is more weighty than that obtained by the nonvoting, preferred shareholders in *John A. Nelson Co.* v. *Helvering, supra:* The petitioners possess not only the primary voting interest in the continuing enterprise, but also the only interests in existence with proprietary and equity rights in the mutual association. To the extent there is any equity at all in a mutual association, it is represented by the share accounts obtained by the petitioners.

To find that the equity of a mutual association is insubstantial, the Court today looks to each equitable power or attribute of mutual share account ownership to determine its value and the extent to which it is actually exercised. The Court values the debt characteristics separately from the equity characteristics of the same instrument to determine whether the equity interest is a substantial part of the value of the property transferred. The only support for the

Court's action of separately valuing the debt and equity aspects of a single instrument is Rev. Rul. 69–265, 1969–1 Cum. Bull. 109. Apparently no court has ever relied on such a distinction with respect to a single instrument. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶4.02, p. 4–7 (4th ed. 1979) ("in litigated cases, classification has been treated as an all-or-nothing question, so that instruments have not been fragmented into part equity and part debt"). Nor does this Court's opinion in *Minnesota Tea Co., supra,* provide any support for the Court's approach today.

The flaw in this approach is most clearly evident in the majority's attempt to explain why a merger between mutual associations qualifies as a tax-deferred reorganization whereas a merger of a stock savings and loan into a mutual association does not. When a more heavily capitalized mutual association is acquired by a thinly capitalized mutual association, the equity component of the value of share accounts will be reduced. Under the majority's separate valuation approach, at some point that value should be reduced so substantially as to defeat claims that a continuing proprietary interest is maintained. The Court avoids this result by noting that "the equity interest represented by the shares received—though small—is equivalent to the equity interest represented by the shares given up." *Ante,* at 142. But the same was true when Commerce merged into Citizens. The equity interest represented by the share accounts in Citizens is the sole and complete equity interest in that association, and it was obtained in exchange for shares in Commerce that represented the equivalent sole equity interest in the stock savings and loan association.

The Court's denigration of each of the equity attributes of a mutual share account is also troubling. The Court notes that the ownership interests in Citizens are "spread over all of the depositors" and that the right to vote "is . . . diluted each

time a loan is made, as each borrower is entitled to one vote." *Ante*, at 138. But such characteristics are by no means confined to mutual share accounts. Dilution of voting power of shareholder equity in all corporations may and frequently does occur with each new stock issue or new class of stock. Yet the threat of dilution has never divested stock of its status as a substantial equity interest. Nor should the fact that mutual accounts are often voted by proxy affect the result: proxy voting, after all, is a common practice among holders of common stock in large corporations as well. Such factors should have no part in the determination of whether the continuing-proprietary-interest test is met. Indeed, this Court has found ownership of *non*voting preferred stock to provide a sufficient proprietary interest. *John A. Nelson Co.* v. *Helvering*, 296 U. S., at 377.

The Court also finds that the right to share in the profits of the association, through dividends and ownership of a share of the assets and undistributed profits of the association, is not controlling. The majority downplays the shareholders' interest in the assets and undistributed profits, a right that is solely one of ownership. It finds that the dividends paid to the shareholders are analogous to interest paid to bank depositors because the dividends are paid at a fixed, preannounced rate and are treated as interest for some other tax purposes. *Ante*, at 138–139. These dividends, however, cannot be properly equated with interest on bank deposits because shareholders have no enforceable legal right to compel the payment of dividends. That the amount of the dividend is preannounced at a suggested rate is not significantly different from preannounced dividends paid by many large corporations, particularly on preferred stock. Although the majority notes correctly that dividends on share accounts are treated like interest on bank accounts for purposes of deductibility by the association as business expenses for income tax purposes, I. R. C. § 591, the reason

for this treatment is unrelated to the classification of mutual shares as equity. Prior to 1951, mutual associations were exempt from income tax. 26 U. S. C. § 101 (1946 ed.). The Revenue Act of 1951, 65 Stat. 452, removed the exemption and provided for the deduction of dividends from the taxable income of the association to prevent the accumulation of tax-exempt income in the associations. Note, Reorganization Treatment of Acquisitions of Stock Savings and Loan Institutions by Mutual Savings and Loan Associations, 52 Ford. L. Rev. 1282 (1984). Tax treatment of the dividends to the association is simply irrelevant to the classification of the instrument received by the shareholder for purposes of determining his proprietary interest.

Finally, the majority concludes that the right to participate in the proceeds of a solvent liquidation is "not a significant part of the value of the shares" because the possibility of a liquidation is remote. *Ante*, at 139. The task at hand is to classify the nature of the mutual share account; the market value of the share account on liquidation is a separate question. The remoteness of the contingency of liquidation cannot reasonably be dispositive of the equity character of the right of the shareholders. The likelihood of liquidation will vary with the particular association and the prevailing economic climate, but the character and nature of the right will not change. To the extent that a mutual association has assets in excess of its liabilities, the share account holders have a right to a proportionate share of those assets in the event of liquidation.

Having unpersuasively attempted to argue away the equity characteristics of the mutual share accounts, the Court then finds⁵ that the debt characteristics outweigh the equity characteristics, concluding that the equity value is "practically, zero." *Ante*, at 140. The Court's reasoning suggests that, no matter how much capital a mutual association possesses, the equity value of its shares is insubstantial because

no one would pay more for the shares than their face value. This result is preordained by the Court's unsupported determination that the value of the "nonequity" features is equal to the face value of the account. By definition, nothing can be left to allocate to the equity features. A more realistic analysis would acknowledge that the equity aspects of a hybrid instrument are intertwined with the debt aspects and cannot be valued in isolation.

The result reached by the Court today is inconsistent with the tax-deferred treatment accorded mergers between two mutual associations or between a stock association and a mutual association when the stock association is the survivor. Compare Rev. Rul. 69–6, 1969–1 Cum. Bull. 104 (merger of a stock association into a mutual association is a sale of assets), with Rev. Rul. 69–3, 1969–1 Cum. Bull. 103 (merger of two mutual associations qualifies as a tax free reorganization), and Rev. Rul. 69–646, 1969–2 Cum. Bull. 54 (merger of mutual association into stock association qualifies as a tax free reorganization). And because a transaction that is a sale rather than a tax-deferred exchange at the shareholder level cannot qualify as a tax-deferred reorganization at the corporate level, see I. R. C. §§ 361 and 381, the result of the Court's holding is to discourage an entire class of legitimate business transactions without regard to the desirability of such mergers from an economic standpoint. This result is directly contrary to the intent of Congress. "Congress . . . adopted the policy of exempting from tax the gain from exchanges made in connection with a reorganization, in order that ordinary business transactions [would] not be prevented on account of the provisions of the tax law." S. Rep. No. 398, 68th Cong., 1st Sess., 14 (1924).

The Court's opinion also has ramifications beyond mutual associations. This case presents the first opportunity for the Court to consider the use of hybrid instruments in reorganizations. Previously, the Court has held that the receipt

of stock, whether common, voting, or nonvoting preferred, satisfies the continuity-of-interest test. If the Court is to now examine the actual exercise of the proprietary rights conferred by ownership of a particular security, it will inevitably reach conflicting results in similar cases. Predicting the tax consequences of reorganizations undertaken for a valid business purpose will become increasingly difficult. I would adhere to precedent and to a clear test and hold that a hybrid instrument which has the principal characteristics of equity ownership should be treated as equity for purposes of the continuity-of-proprietary-interest requirement. If the value of that instrument considered as a whole represents a substantial part of the value of the property transferred, in my view the continuity-of-interest requirement is satisfied and the transaction should qualify as a tax-deferred reorganization. I, therefore, dissent.