848 A.2d 137

**DEUTSCH, LARRIMORE & FARNISH, P.C., Appellant,**

v.

**Joyce & William JOHNSON and Morgan Stanley Dean Witter, Inc., Appellees.**

**Ruth S. Libros, Intervenor.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 2003.

Decided April 29, 2004.

638

Dale G. Larrimore, Esq., Thomas S. Farnish, Esq., for Deutsch, Larrimore & Farnish, P.C.

Alan Gershenson, Esq., for Morgan Stanley Dean Witter, Inc.

Joyce and William Johnson, for Joyce and William Johnson, *pro se.*

Joshua Sarner, Esq., Leonard Sarner, Esq., for Ruth S. Libros.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, and LAMB, JJ.

### *OPINION ANNOUNCING THE JUDGMENT OF THE COURT*

Justice NEWMAN.

In this appeal, we must determine whether a judgment creditor can attach the funds in a joint account where the judgment is lodged against a noncontributing party to that joint account. Reduced to its essence, the real question is whether Joyce Johnston (Daughter) has a sufficient present interest in the joint account established by her mother, Ruth Libros (Libros), an intervenor in the present matter, to subject it to execution for a judgment against her alone. We are of the opinion that she does not.

## FACTS AND PROCEDURAL HISTORY

Deutsch, Larrimore & Farnish, P.C. (DL & F) appeals from an Order of the Superior Court that affirmed an Order of the Philadelphia County Court of Common Pleas (trial court) that granted the Petition to Intervene, Stay and Set Aside the Writ of Execution filed by DL & F on a Morgan Stanley Dean Witter (MSDW) brokerage account. In 1994, Libros opened an Active Assets brokerage account with MSDW.[1] This was a joint account between Libros, Daughter, and her son, Joel B. Sarner (Son). At the time that she opened her MSDW account, she expressed to her account executive her wish that, so long as she was alive and in full control of her faculties, she would retain the ownership of, control of, and access to the account. Libros created the account so that her children could make withdrawals if she became incapacitated, as well as to fulfill her desire to use it as an estate planning device. Libros maintains that the monies in the account remain hers and that the account is titled jointly only as a matter of convenience. It is undisputed among the parties that Libros made all contributions to the brokerage account.

From time to time, Libros issued checks and made withdrawals from the account. She alone possessed the passbook, earned and received all dividends and interest, and was the only one to report capital gains and losses from the account on her federal, state, and city income tax returns. She funded the account with sums from previously held investment accounts, some of which she had held individually, some of which she had held jointly with either Daughter or Son. Neither Daughter nor Son was aware of the previous joint accounts. In the mid–1990s, Libros instructed MSDW to restrict access to the account to her, alone. MSDW placed an operational memo on the account, based on the instructions provided by Libros, that, in the event that MSDW received conflicting instructions from any of the joint tenants, they were to freeze the account until Libros clarified the instructions.

1. The Active Assets Account was a securities account that also included check writing privileges and the option of securing loans against any balances.

Daughter, while employed as a bookkeeper for DL & F, committed various acts of theft and forgery for which she was later convicted in a criminal proceeding. In 1997, DL & F obtained a civil judgment against Daughter for $300,000. Whether as partial restitution, an attempt to ameliorate Daughter's punishment, or for some other reason unknown to this Court, Libros gave DL & F a check for $60,000.00 drawn on the MSDW account. Now aware of the joint account and in an attempt to satisfy the judgment, DL & F filed a Praecipe for a Writ of Execution on the Active Assets account. Libros countered with a Petition to Intervene, Stay and Set Aside the Writ of Execution. Following a hearing, the trial court granted the Petition of Libros, and stayed and set aside DL & F's Praecipe for the Writ. The trial court concluded that, pursuant to the Multiple–Party Accounts Act (MPAA), 20 Pa.C.S. §§ 6301–6306, the joint account belonged entirely to Libros because she was the sole contributor. The trial court also determined that, even if the MPAA did not apply, pursuant to common law principles, the evidence established that Libros retained full dominion over the funds in the account and that Libros did not intend to give Daughter a present interest in it.

Believing itself to be bound by its prior decision in *In re Estate of Eastman*, 760 A.2d 16 (Pa.Super.2000),[2] the Superior Court affirmed the Order of the trial court, finding that the MPAA applied to the brokerage account. The Superior Court opined that, pursuant to the MPAA, "[a] joint account belongs, during the lifetime of all parties, to the parties in proportion to

2. In that case, Merle Eastman established a joint PNC brokerage account with rights of survivorship in his son and daughter. This account was funded with the proceeds of the sale of his house in Edinboro, Pennsylvania and a portion of a brokerage account with Solomon Smith Barney. Three months later he married and subsequently sought to create a new joint account with his new wife. Although both parties signed the papers creating the new account, they were never returned to PNC until after the death of Mr. Eastman. Mr. Eastman died within a few months of signing the signature card and his wife asserted that her husband had established an immediate *inter vivos* gift of the assets of the account to her when he signed that signature card. The Superior Court held that: (1) there was no gift; (2) Mrs. Eastman could not act as agent for her husband after his death by delivering the signature card to PNC; and (3) the proceeds of the original account passed by operation of law to the son and daughter.

the net contributions by each to the sum on deposit, unless there is clear and convincing evidence of a different intent." 20 Pa.C.S. § 6303(a). As Libros was the only contributor to the account, the Superior Court determined that the assets of the account belonged solely to her and that DL & F was not entitled to its Writ of Execution.

## DISCUSSION

Chapter 63 of the Probate, Estates, and Fiduciaries Code covers joint accounts and trust accounts. 20 Pa.C.S. § 6301. Excluded are deposits of partnerships, joint ventures, or other associations for business purposes; accounts controlled by one or more persons as the duly authorized agent or trustee for a corporation, unincorporated association, charitable or civic organization; and regular fiduciary or trust accounts where the relationship is established other than by the deposit agreement. *Id.* "Account" is defined broadly as "a contract of deposit of funds between a depositor and a financial institution." *Id.* Checking accounts, saving accounts, certificates of deposit, and share accounts are specifically enumerated, as are "other like arrangements." *Id.* The term "financial institution" is also broadly defined and includes "any organization authorized to do business under State or Federal laws relating to financial institutions, including, without limitation, banks and trust companies, savings banks, building and loan associations, savings and loan companies or associations and credit unions." *Id.* Thus, virtually all "fund deposit" transactions with "financial institutions" doing business pursuant to state and federal laws are affected by the MPAA.

The MPAA defines the rights of the parties to a multiple-party account using a testamentary transaction rationale. The essence of a testamentary transaction is the transferor's intent to create in his transferee no interest in the property transferred until or after the death of the transferor. Pursuant to Section 6303(a), "[a] joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sum on deposit, unless there is clear and convincing evidence of a different intent." 20 Pa.

C.S. § 6303(a). Consequently, the depositor in a joint account is presumed to retain ownership of the sums he or she has placed on deposit during his or her lifetime in proportion to the total fund. Upon the death of a party to a joint account, the amount in the account "belongs to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time the account is created." 20 Pa.C.S. § 6304(a).

In the instant matter, DL & F argues that the MPAA does not apply to brokerage accounts. Specifically, DL & F contends that a brokerage account does not fall within the statute's definition of "account." According to DL & F, because there is no "contract of deposit of funds," the brokerage account is not an "account" for purposes of the MPAA. Furthermore, DL & F submits that MSDW is not a "financial institution" as that term is defined in the statute. DL & F maintains that courts in other jurisdictions have also come to these same conclusions when construing the Uniform Probate Code, the code on which the Multiple–Party Accounts Act is based. *See Union National Bank of Texas v. Ornelas–Gutierrez*, 772 F.Supp. 962 (S.D.Tex.1991) (finding that the investment by UNB in book-entry United States Treasury bills on behalf of a depositor was not an "account" as defined by the Texas Probate Code, but rather was a brokerage-custodial agreement between UNB and the depositor); *Berg v. D.D.M.*, 603 N.W.2d 361 (Minn.App.1999) (holding that father's investment account with stock brokerage firm was not a multiple-party account available for payment of child support).

## *Multiple Party Account*

The MPAA defines an "account" to include traditional banking accounts, certificates of deposit, "share accounts, and other like arrangements." While a brokerage account is not one of the enumerated services of a financial institution in that it is not a checking or savings account, we believe that a brokerage account is encompassed within the purview of "share accounts, and other like arrangements." Share accounts are commonly a form of investment in savings and loans and in credit unions.

They are essentially a hybrid security. Share accounts are often transferable by assignment and, because the bulk of the funds of a savings and loan are invested in mortgages, these shares resemble an investment pool. Share account holders retain all rights of corporate stockholders and "dividends on share accounts are treated like interest on bank accounts for purposes of deductibility...." *Paulsen v. Commissioner of Internal Revenue,* 469 U.S. 131, 149, 105 S.Ct. 627, 83 L.Ed.2d 540 (1985) (O'Conner, J. dissenting). *See also Porter v. Aetna Casualty & Surety Co.,* 370 U.S. 159, 82 S.Ct. 1231, 8 L.Ed.2d 407 (1962) (Douglas, J. concurring). We believe that the similarities between multi-service brokerage accounts and share accounts bring them, at a minimum, within the authority of "other like arrangements." This conclusion is supported by the decision of this Court in *Balazick v. Ireton,* 518 Pa. 127, 541 A.2d 1130 (1988), in which the Balazicks created a separate joint account with each of their five children. Each of the accounts was in the form of a repurchase agreement in which the bank acquires government securities and sells an interest in these securities to its individual customers. *Id.* at 1130 n. 1. "Ownership of the securities is not transferred to the customer, and the bank does not create a deposit contract," but "issues a receipt indicating the ownership of the interest [that] has been created...." *Id.* This Court concluded that the repurchase agreement was not unlike a share account and that the MPAA applied. A brokerage account, such as the Active Assets Account of Libros, is similar in form and function to the repurchase agreement in *Balazick.* The General Assembly broadly defined "account" and we see little difference between a share account, repurchase agreement, and a brokerage account.[3]

3. The Concurring Opinion posits that the MSDW Active Assets account also meets the statutory definition of "financial institution" because of the evolving nature of financial services, and finds significance in the fact that MSDW permits the "[d]aily sweep of all available cash into" a FDIC insured account. It should be noted, however, that Mr. William L. Mezey, Vice President of MSDW, testified that the none of the assets held by MSDW are insured by the FDIC. (Notes of Testimony, December 13, 2000, pages 38–39.)

*Financial Institution*

■ DL & F also contends that MSDW is not a financial institution by definition. We must disagree.

"Financial Institution" is defined differently within our Pennsylvania statutes, depending upon the section to which the term relates. Pursuant to Chapter 51C of the Banking Code, "financial institution" is defined narrowly to include:

[A]ny national banking association, State-chartered bank, bank and trust company, savings bank, or private bank, Federal savings and loan association, State-chartered building and loan association or credit union, or any stock insurance company, including any stock life or limited life, stock fire, stock marine, stock fire and marine, or stock casualty company, any mutual insurance company, including any mutual life or limited life company or any surety company, title insurance company, Lloyds association, or inter-insurance exchange, which is authorized by law to transact the business of insurance in Pennsylvania.

7 P.S. § 6040–2. *See also* Section 2201–A of the Second Class Township Code, 16 P.S. § 5201–A. However, pursuant to the Insurance Code, an "organization" means "[a]ny bank, savings and loan association, credit union, mutual fund, money market fund, stock broker *or other similar financial institution*" which is "regulated by Federal or state law. . . ." 40 P.S. § 46 (emphasis added). Hence, there is no single definition of "financial institution" contained within Pennsylvania statutes and, while the term "financial institution" may not be inherently ambiguous, within the context of its description as "any organization authorized to do business under State or Federal laws related to financial institutions," a certain ambiguity may be implied. The definition of "financial institution" in the Sixth Edition of Black's Law Dictionary defines "financial institution" as, *inter alia,* "[a]n insured bank . . . a thrift institution . . . a broker or dealer registered with the Securities and Exchange Commission . . . an investment banker or investment company. . . ." Black's Law Dictionary 630 (6th Ed.). In the instant matter, the General Assembly has defined "financial institution" broadly and the distinguishing

characteristic of a "financial institution" within the MPAA is the state or federal law definition of "financial institution." As previously indicated, one or more state statutes define "financial institution" broadly enough to include an investment firm such as MSDW. Some federal statutes do likewise. *See e.g.,* 11 U.S.C. § 101; *see also Geertson v. McCrea,* 37 Pa. D. & C.3d 583 (1983). Accordingly, we believe that the term "financial institution" sweeps broadly enough pursuant to the MPAA to include MSDW.

### Interest of Johnson

Having determined that the MSDW Active Assets Account is an "account" within the purview of the MPAA, and that MSDW falls within the ambit of a "financial institution" pursuant to the broad definition of "financial institution" contained in the MPAA, we must now determine Daughter's present interest in the account and whether the account funds are available to satisfy the Judgment of DL & F.

Joint accounts are occasionally referred to as a "poor man's will." *In re Ingels' Estate,* 372 Pa. 171, 92 A.2d 881 (1952). *See also Robinson v. Delfino,* 710 A.2d 154 (R.I.1998) (joint bank accounts often referred to as "poor man's will" and are most often employed by persons with small estates); *Blanchette v. Blanchette,* 362 Mass. 518, 287 N.E.2d 459 (1972) (joint stock account). This is because, pursuant to the Probate Code, "[a]ny sum remaining on deposit at the death of a party to a joint account belongs to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intent at the time the account is created." 20 Pa.C.S. § 6304(a). Thus, joint accounts provide a simple and inexpensive method of passing funds in the account from a deceased joint owner to the surviving joint owner, avoiding the necessity of probate proceedings. However, that utility is lost if, during the lifetime of the joint depositors, the funds on deposit can be reached by a judgment creditor of either party. If the creator of the joint account, whose intent is usually testamentary in nature, could be impoverished by the acts of the joint tenant over which the

creator has no control, such as attempts of the other joint tenant or her creditors to reach the funds, there is great risk to the creator of the joint account. It may be these evils that Section 6303(a), 20 Pa.C.S. § 6303(a), was intended to limit, lending stability and security to the creation of joint bank accounts.

It is axiomatic that a judgment attaches only to the interest that the judgment debtor has in the property, and the judgment cannot attach to any greater interest than either the debtor herself has, or, in the exercise of her rights, could have voluntarily transferred. *Overbrook Heights Bldg. & Loan Ass'n v. Wilson*, 333 Pa. 449, 5 A.2d 529 (1939); *Ellwanger v. Moore*, 206 Pa. 234, 55 A. 966 (1903). Therefore, it is paramount to the relief sought by DL & F that Daughter be vested with an ownership interest in the Active Assets account.

The Pennsylvania legislature enacted the MPAA on the assumption that "a person who deposits funds in a multiple-party account normally does not intend to make an irrevocable gift of all or any part of the funds represented by the deposit. Rather, he [or she] usually intends no present change of beneficial ownership." Official Comment to 20 Pa.C.S. § 6303. Section 6303(a) is fundamental to the resolution of the issue at hand and states, in pertinent part, that "[a] joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sum on deposit, unless there is clear and convincing evidence of a different intent." 20 Pa.C.S. § 6303(a). This Section clearly sets forth the ownership rights to the assets of the joint account during the lifetime of the parties, and the General Assembly did not intend to allow a holder of an interest in a joint account to defeat the ownership rights of other joint owners with a unilateral act. Absent an *inter vivos* gift by Libros, Daughter had no ownership interest at the time that DL & F sought to satisfy its judgment; at most she had a mere expectation of a right of survivorship.

In the instant matter, Libros produced significant and compelling evidence in her own testimony and that of her account executive that the transfer was effectuated as a convenience to herself and without the intent to make an *inter vivos* gift. This evidence was unrebutted and is consistent with the presumption supplied in the comments to Section 6303 of the MPAA that state:

> The theory of these sections is that the basic relationship of the parties is that of individual ownership of values attributable to their respective deposits and withdrawals; the right of survivorship which attaches unless negated by the form of the account really is a right to the values theretofore owned by another which the survivor receives for the first time at the death of the owner. *That is to say, the account operates as a valid disposition at death rather than as a present joint tenancy.*

Official Comment to 20 Pa.C.S. § 6303 (emphasis added).

### CONCLUSION

One who knowledgeably creates a joint account with another arguably does so with the present intent to employ the account's survivorship characteristic in substitution for a testamentary device. Furthermore, accounts with right of survivorship provisions are often set up to allow caretakers to assist senior citizens with the management of their finances. Their well-planned financial protection can best be honored by adhering to the statutory presumption created by Section 6303. Like other testamentary devices, creation of a joint account, without more, accomplishes no present transfer of title to property. If, as in this case, one person deposits all sums in the joint account, this arrangement contemplates transfer of title to those funds to the other person or persons named on the account upon the death of the depositor. Moreover, the creator of a joint account, like the maker of a will and unlike the giver of a gift, may change his or her mind prior to death. These considerations suggest that joint accounts share more in the character of testamentary devices

than they do in the character of present transfers of property, or gifts.

We hold that insomuch as Libros contributed all of the funds present in the Active Assets Account and, because there was no clear and convincing evidence of an intent to make an *inter vivos* gift, she alone owned the assets in the account. Daughter had no ownership interest and, thus, the account assets were not subject to execution by DD & F in its attempt to satisfy its Judgment against her.

Accordingly, this Court has determined that the MPAA applies to the Active Assets account held by Libros and that the trial court properly granted her Petition to Intervene, Stay and Set Aside Writ of Execution. Thus, we affirm the Order of the Superior Court.

Former Justice LAMB did not participate in the decision of this case.

Justice SAYLOR files a concurring opinion, joined by Justice CASTILLE, who also joins the opinion announcing the judgment of the Court.

Chief Justice CAPPY files a dissenting opinion in which Justice NIGRO joins.

## CONCURRING OPINION

Justice SAYLOR.

In my view, the scope of the terms "account" and "financial institution" under Section 6301 of the Multiple–Party Accounts Act, 20 Pa.C.S. § 6301, must be assessed in light of both the open-ended statutory definitions and, as important, the evolving nature of financial services. Concerning the brokerage account, I do not believe that it is necessary to characterize it as akin to a "share account" to fall within the statutory definition, particularly since the latter is generally employed to denote a specific arrangement in the context of a credit union or savings and loan association. *See, e.g., Credit Union Nat'l Ass'n., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 700

F.Supp. 1152, 1154–55 (D.D.C.1988). Rather, for the same reason that share accounts are included in the definition, namely, because of their similarity to bank accounts, I would treat the account at issue as sufficiently analogous to a bank account. Here, the record indicates that the Active Assets Account provided by Morgan Stanley Dean Witter included characteristics generally associated with traditional bank accounts, for example, check writing privileges, loan privileges, a VISA debit card, a personal identification number for VISA card and ATM cash withdrawals, preprinted deposit slips, direct deposit of social security or payroll, and the placement of cash into a money trust, government trust, tax-free money market trust account or, significantly, an FDIC insured account. In addition, the account assets could include, *inter alia*, cash, certificates of deposit, money market funds, municipal bonds, stocks, government securities, mutual funds, and annuities.

Similarly, I do not believe that it is necessary to view the phrase "financial institution" as impliedly ambiguous, inasmuch as the definition in Section 6301 specifically states that it is "without limitation." Moreover, consistent with the definition in Section 6301, the testimony at the hearing from a Morgan Stanley Dean Witter vice president indicated, *inter alia*, that the company provides a wide range of financial services and is subject to federal regulation. It is also noteworthy that the definition of financial institution varies within the Probate, Estates and Fiduciaries Code. *Compare* 20 Pa. C.S. § 6301 *with* 20 Pa.C.S. § 6401 (defining financial institution as "[a]ny regulated financial institution insured by the Federal Deposit Insurance Corporation or its successor or an affiliate of the financial institution"). Given the General Assembly's express and substantial limitation upon the scope of the definition of a financial institution in Section 6401, it is at least arguable that the more open-ended definition contained in the Multiple–Party Accounts Act was intended to sweep more broadly.

Finally, as the definitions for account and financial institution in Section 6301 are not specifically limited in scope,

consideration of the dramatic changes in financial services that have occurred in recent years is appropriate. For example, the historical division between commercial banking institutions and firms engaged in securities investments reflected in the Glass–Steagall Act, *see* Act of Jun. 16, 1933, ch. 89, 48 Stat. 188, was partially abrogated with the enactment of the Gramm–Leach–Bliley Financial Services Modernization Act, *see* Pub.L. No. 106–102, 113 Stat. 1338 (1999) (permitting, *inter alia,* the affiliation of banks and security firms). Indeed, even prior to repeal of the Glass–Steagall Act, the drafters of the 1989 amendments to the Uniform Probate Code (from which the Multiple–Party Accounts Act is derived), acknowledged that, while the function of assets in a bank account is distinct from those in a security account:

> [T]his distinction between bank accounts and securities has begun to crumble. Banks are offering certificates of deposit of large value under the same account forms that were devised for low-value convenience accounts. Meanwhile, brokerage houses with their so-called cash management accounts and mutual funds with their money market accounts have rendered securities subject to small recurrent transactions. In the latest developments, even the line between real estate and bank accounts is becoming indistinct, as the "home equity line of credit" creates a check-writing conduit to real estate values.

Uniform Probate Code art. VI prefatory note (revised 1989 version), 8 U.L.A. 428 (1997).

On this record, therefore, and in light of the realities of the financial industry, I agree that there is sufficient evidence to apply Section 6303(a) of the Multiple–Party Accounts Act, 20 Pa.C.S. § 6303(a). *Cf. In re Estate of Ashe,* 117 Idaho 266, 787 P.2d 252, 254 (1990) (recognizing the evolving nature of financial services in acknowledging that litigants may be able to demonstrate that stock brokerage firms are financial institutions under Idaho's Probate Code).

Justice CASTILLE joins this concurring opinion.

### DISSENTING OPINION

Chief Justice CAPPY.

At issue here is whether the Multi–Party Accounts Act ("MPAA"), 20 Pa.C.S. §§ 6301–6306, applies to a brokerage account consisting of securities which was maintained by a stock brokerage investment firm. As I do not believe that Morgan Stanley Dean Witter ("MSDW"), which holds the brokerage account in question, is a "financial institution" per the MPAA, I cannot agree that the MPAA applies. I therefore must respectfully dissent.

As noted by the Opinion Announcing the Judgment of the Court ("OAJC"), the MPAA applies only where there is an "account" held by a "financial institution". 20 Pa.C.S. § 6301. "Financial institution" is defined by our MPAA as "any organization authorized to do business under State or Federal laws relating to financial institutions, including, without limitation, banks and trust companies, savings banks, building and loan associations, savings and loan companies or associations and credit unions". Relying on *Blacks Law Dictionary*, the majority finds that this definition includes a broker or dealer registered with the Securities and Exchange Commission [SEC].... OAJC slip op. at 7–8 (citation omitted).

In my view, the OAJC broadens the MPAA's definition of financial institution to the point of distortion. The MPAA goes to great lengths, almost to the point of redundancy, to define financial institution as encompassing all types of banks and savings institutions. There is nothing in the plain language, however, which would indicate that the MPAA's definition of financial institution encompasses brokerage firms regulated by the SEC. I believe that by holding that the MPAA's definition of financial institution encompasses SEC-regulated brokerage firms, the majority has not interpreted the MPAA so much as it has rewritten it.

As I would find that the MPAA does not apply to this matter, I would reverse the order of the Superior Court, and

remand the matter to that court for it to review any other issues raised before that court on appeal.

Justice NIGRO joins this dissenting opinion.