**CREDIT UNION NATIONAL ASSOCIATION, INC., et al., Plaintiffs,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Defendant.**

Civ. A. No. 88–1295–OG.

United States District Court, District of Columbia.

July 28, 1988.

---

**34.** Gartmon and Johnson admitted their participation in the irregularities.

Paul J. Lambert, Washington, D.C., for plaintiffs.

Richard M. Ashton, Atty., Federal Reserve Bd., Bradley L. Kelly, Asst. U.S. Atty., Washington, D.C., for defendant.

John J. Gill, Michael F. Crotty, Washington, D.C., for amicus curiae American Bankers Assn.

## MEMORANDUM

GASCH, Senior District Judge.

### I. INTRODUCTION

This matter is before the Court on cross-motions for summary judgment. The

Board of Governors of the Federal Reserve System (the "Board") has also moved to dismiss the case for lack of standing. The Court has accepted for filing the submission of the American Bankers Association (the "ABA") as amicus curiae. Plaintiffs, Dearborn Federal Credit Union ("Dearborn") and Credit Union National Association, a trade association representing credit unions, challenge one provision of Regulation CC, 53 Fed.Reg 19,435 (May 27, 1988) (to be codified at 12 C.F.R. § 229.2(z)) ("Regulation CC"), which was promulgated on May 11, 1988, by the Board under the Expedited Funds Availability Act of 1987, 12 U.S.C. §§ 4001–4010 (the "Act"). Plaintiffs contend that the challenged regulation defines "originating depository institution" in a manner that is so substantially different from the statutory definition that it produces a different result from what was intended by Congress.

The case concerns the application of the challenged provision to credit union share drafts with respect to determining whether they are local or nonlocal for purposes of the maximum "check-holds" set forth in the Act. Rather than basing that determination on the location of the credit union on which the share draft is drawn, the Board concluded that the location of the credit union's "payable through" bank would determine whether a share draft was local or nonlocal for purposes of the Act. The Court agreed to hear this matter on an expedited basis, because the challenged regulation will go into effect on September 1, 1988.

## II. BACKGROUND

### A. *The Check Collection System*

Traditional checks, as opposed to share drafts, that are deposited or cashed in a bank are processed or cleared through a check collection process. As a general rule, the bank that receives a check for deposit drawn on a different depository institution processes it for payment in one of two ways: (1) it sends the check directly for presentment to the bank on which a check is drawn; or (2) it sends the check through a clearinghouse, a corresponding bank or the Federal Reserve System for presentment to the bank on which the check is drawn. If the bank on which the check is drawn (the "payor" or "drawee" bank) refuses to honor the check for insufficient funds or some other reason, the check will be returned to the bank of first deposit along the same path it followed to be presented.

The check clearing process takes time, particularly when checks deposited are drawn on accounts not located within the depository institution. There is some risk of nonpayment to the depository institution if the funds deposited are made available to its customer before the check has cleared. As a result, some banks have imposed "holds" on checks not drawn on their accounts, making funds available to their depositors only after sufficient time has elapsed for notification that the check has cleared. In the case of those banks that currently impose holds, checks drawn on banks located within the same city as the depository institution are usually made available more promptly than those drawn on nonlocal banks. Some banks currently impose no holds on any of their customers' deposits. Other banks do not impose holds on deposits made to certain customers' accounts, depending on the nature of the customer and their relationship with the bank. The Expedited Funds Availability Act does not require holds to be imposed; it only limits the duration of check holds based on whether the check is local to the depository institution or not.

### B. *Share Draft Accounts*

Credit unions, unlike banks, are cooperative and nonprofit depository institutions, which provide to their members, among other bank-like services, share draft accounts.[1] Share draft accounts are the equivalent of checking accounts, in that they are used by members in the same

---

**1.** The statutory definition of "depository institution" includes credit unions. 12 U.S.C. § 4001(12) (adopting the definition provided in the Federal Reserve Act, 12 U.S.C. § 461(b)(1)(A)(iv)).

manner that bank customers employ their checking accounts.[2] Share drafts are drawn on the credit union by a member, payable to a specific payee out of the share draft account maintained by the member of the credit union.

Most credit union share drafts are "payable through" one of five banks nationally ("payable through banks") that specialize in the processing of share drafts. About seventy-five percent of the 6000 credit unions offering share draft accounts use payable through banks for collection and processing. Over 3000 of these credit unions use one of the five national payable through banks. Payable through banks are an efficient and cost effective method of collecting and processing share drafts.

A share draft, although it looks like an ordinary bank check, normally carries both the credit union's name and the name of its payable through bank on its face. *See* B. Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 10.9[1](a) (rev. ed. 1981). Usually the routing number of the payable through bank is imprinted with machine readable magnetic ink characters at the bottom of the share draft, providing for expeditious processing. The payable through bank functions as a collecting bank to present the share draft to the credit union as drawee, but is not authorized to pay the item. *Id.* The payable through bank serves as the credit union's vital link to the Federal Reserve System for collection purposes. *Id.*

When a share draft is deposited or cashed, it is sent through the check collection system to the payable through bank for presentment to the credit union on which it is drawn. The payable through bank presents the share draft electronically to the credit union on the same day it is received. On the next day, the credit union responds electronically to the payable through bank that it will either honor or dishonor the share draft.[3] If the credit union refuses to pay the share draft, it is sent back through the check collection system to the depository bank.

### C. The Expedited Funds Availability Act

The Expedited Funds Availability Act (the "Act") was passed as part of the Competitive Equality Banking Act of 1987, Pub. L. No. 100–86. In the Act, Congress addressed a perceived abuse by depository institutions in delaying their customers' access to funds deposited by check into their accounts. The Act seeks to ensure prompt availability of funds and to expedite the return of checks. The Act creates maximum time periods within which depository institutions must make funds deposited by check available for withdrawal. Under the statutory scheme, the availability of funds depends on whether the check is "local" or "nonlocal."

The Act provides for a transitional period between September 1, 1988 and August 31, 1990, during which time "not more than 2 business days shall intervene between the business day on which funds are deposited in an account at a depository institution by a check drawn on a local originating depository institution and the business day on which such funds are available for withdrawal." 12 U.S.C. § 4002(c)(1).[4] The Act further provides that during the transitional period, not more than six business days shall intervene between the date of deposit of a check drawn on a nonlocal originating depository institution and the business day

---

**2.** Under the Act, share drafts are covered by the statutory definition of the term "check." 12 U.S.C. § 4001(7).

**3.** Most share drafts, including those used by members of plaintiff Dearborn Federal, are "truncated" at the payable through bank. Truncation refers to the practice whereby the actual paper share draft is retained by the payable through bank, which is responsible for maintaining a copy of the share draft for the member. B. Clark, *supra* at ¶ 10.6. The members receive a monthly statement showing which share drafts have been paid, but without return of the actual paper share drafts.

**4.** The Act defines "local originating depository institution" as "any originating depository institution which is located in the same check processing region as the receiving depository institution." 12 U.S.C. § 4001(13). "Check processing region" refers to the 48 Federal Reserve check processing regions located throughout the country.

on which such funds are available for withdrawal. 12 U.S.C. § 4002(c)(2).[5] After the transitional period, shorter hold periods of one intervening business day on local checks and four intervening business days on nonlocal checks will be the rule. 12 U.S.C. § 4002(b).

### D. *Federal Reserve Board Regulation CC*

The Act defines the term "originating depository institution" as the branch of a depository institution on which a check is drawn. 12 U.S.C. § 4001(17). In the challenged regulation, the Board substituted the term "paying bank"[6] for the term "originating depository institution." As a result, the nature of share drafts drawn on credit unions that use payable through banks ("payable through share drafts") will be determined by the location of the payable through bank, rather than the location of the credit union itself.

After the proposed regulation was published, the Board received 72 comments on the definition of "paying bank." Fifty commentors objected to the inclusion of payable though banks within the definition of paying bank.[7] These commentors pointed out, among other things, that the statutory definition of "originating depository institution" was the branch of a depository institution on which a check is drawn. The Board responded that the Act "does not explicitly include payable through or payable at banks." The Board stated that it

believed the Act did not specify the treatment of payable through drafts for the purposes of availability, or other purposes. The Board further asserted that the Act does not define the term "drawn." While acknowledging that in a technical sense the institution on which a check is drawn refers to the institution holding the drawer's account, the Board stated that "the term [drawn] can be used more generically to designate the person to whom a draft is directed and who is requested to pay the amount specified." 53 Fed.Reg. 19390.

Finding that "depository institution on which a check is drawn" could refer to either the institution at which the customer's funds are held or to the institution through which a draft may be payable, the Board turned to specific examples. Using the example of a credit union share draft, the Board suggested that it is unclear from the terms of the statute which institution Congress intended to be the originating depository institution (the credit union) or its payable through bank. 53 Fed.Reg. 19,-391. Concluding that the term was capable on its face of more than one meaning, the Board then turned to the legislative history and purposes of the statute to make its determination. The Board found that credit union share drafts "were intended to be viewed as drawn on the payable through institution for purposes of determining whether they are local or nonlocal checks." *Id.* The Board stated that its "approach is consistent with the Act's designation of

---

**5.** The Act defines "nonlocal originating depository institutions" as any originating depository institution which is not a local depository institution. 12 U.S.C. § 4001(15).

**6.** The Board defined "paying bank" as:
(1) The bank by which a check is payable, unless the check is payable at or through another bank and is sent to the other bank for payment or collection;
(2) The bank at or through which a check is payable and to which it is sent for payment or collection;
(3) The bank whose routing number appears on a check in magnetic ink or in fractional form and to which the check is sent for payment or collection;
(4) The Federal Reserve Bank or Federal Home Loan Bank by which a check is payable; or

(5) The state or unit of general local government on which a check is drawn.
53 Fed.Reg. 19,435 (May 27, 1988) (to be codified at 12 C.F.R. § 229.2(z)).

**7.** The government states that of the 1,000 comment letters received by the Board on the proposed regulation, only 50 commentors objected to the inclusion of payable through banks within the definition of "paying bank," as if to suggest that the relatively small number of comments on the definition reflects on their merit. Presumably, however, these fifty commentors represented *all* of the credit unions that made comments on the provision. *See* 53 Fed.Reg. 19373 n. 2 (stating that 5% of the 1000 commentators were credit unions).

checks as local or nonlocal based on the time required for the collection and return of the checks." *Id.*

The Board further rationalized its result by stating that there would be an increased risk of check fraud if the location of the credit union itself determined whether the share draft was local or nonlocal. The risk of fraud feared by the Board was based on the fact that drafts sent to the payable through institution for collection routinely would be returned after funds would have to be made available under the availability schedules for local checks in the Act. In response to some comments that the treatment of payable through share drafts as nonlocal checks would reduce the acceptance of these instruments, the Board stated that on balance, it did not "believe this potential for a lower acceptance of credit union share drafts offsets the risks of increased fraud to other banks," concluding that on balance a different approach to the treatment of payable through share drafts was not warranted. 53 Fed.Reg. 19,391.

Another rationale offered by the Board for its treatment of payable through share drafts was expediency. The Board found that to base the nature of the payable through share draft on the location of the credit union would "greatly complicate the tasks of banks taking share drafts for deposit." 53 Fed.Reg. 19,391. This analysis was premised on the universal use of machine-read magnetically encoded routing numbers in processing share drafts. As stated previously, the routing number on payable through share drafts refers to the payable through bank, and not to the credit union itself. The Board concluded that these routing numbers represented the only practicable method for depository institutions to determine whether a share draft is local or nonlocal. *Id.*

## III. DISCUSSION

### A. *Standing*

The Board of Governors of the Federal Reserve System has moved to dismiss on grounds that the plaintiffs lack standing. In order to satisfy the standing requirements of Article III of the Constitution and the Administrative Procedures Act, plaintiffs first must establish an actual or threatened injury that fairly can be traced to the challenged agency action. *Wilderness Society v. Griles*, 824 F.2d 4, 11 (D.C. Cir.1987). Second, the injury must be to an interest that arguably is within the zone of interests to be protected or regulated. *Id.* Third, plaintiffs must show that the injury is likely to be redressed by a decision rendered in favor of the plaintiff. *Id.*

#### 1. Injury

■ Plaintiffs assert that they are threatened with injury by the Board's substitution of the term "paying bank" for the term "originating depository institution" used by Congress. As stated previously, Regulation CC allows depository institutions to treat share drafts payable through nonlocal banks as nonlocal items, even if the credit union is local to the depository institution.

For example, plaintiff Dearborn is located in Dearborn, Michigan. All of its share drafts are payable through Chase Manhattan Bank, N.A., located in New York, New York. Under Regulation CC, if a Dearborn member writes a share draft payable to a local merchant, the share draft may be treated by the merchant's depository institution as a nonlocal item. As a result, the merchant's bank may withhold the funds deposited into the merchant's account by a Dearborn share draft for a longer period of time than it would if Dearborn's share draft were treated as a local item. Thus, if the regulation becomes effective in its present form, the share drafts of many credit unions using the specialized national payable through banks may be treated as nonlocal items, even if they are drawn on local credit union accounts, deposited in local banks, and cleared as quickly as local checks.

The credit unions contend that they are threatened with injury by the potential decrease in competitive vitality and potential loss of customers that the regulation's treatment of payable through share drafts will cause. The Court agrees. Plaintiffs face the substantial likelihood of several repercussions from Regulation CC as it

stands. As a result of the longer holds allowable on share drafts, the challenged provision will likely cause credit union share drafts to be judged an unacceptable or less favorable form of payment by some people and businesses to whom they are given in payment for goods and services. In turn, some members of credit unions may terminate their share draft accounts and open checking accounts at competing banks and savings and loan associations. Additionally, in the ever-increasing competition between financial institutions, some banks and savings and loan associations will likely distinguish the holds allowable on their checks from those allowable on share drafts in disclosure statements and sales literature, luring credit union members to terminate their share draft accounts and open checking accounts at those competing institutions.

Should Regulation CC remain in effect as promulgated, the credit unions also contend that they will be compelled to make the costly conversion to using local check processing banks or to process their own share drafts in-house, in order to avoid the stigma of the longer holds caused by the use of specialized nonlocal payable through banks. Dearborn's board of directors has already determined that it will convert to in-house processing if Regulation CC is implemented as promulgated. According to plaintiffs, the necessary change in processing of share drafts will produce economic injury and diminish their effectiveness as competitors with banks and other financial institutions. The use of specialized national payable through banks, such as Chase Manhattan Bank, not only provides credit unions with access to the Federal Reserve System, it also provides an economical and expeditious means for processing share drafts.

The Board characterizes plaintiffs' allegations of threatened injury as speculative and hypothetical, stating that it is conjectural to say that the third parties on which the injury depends will react to the challenged regulation in the manner feared by plaintiffs. The Board argues that the repercussions feared by plaintiffs were capable of occurring in equal measure prior to Regulation CC. In the same vein, the thrust of the amicus brief is that in all the fourteen years of share drafts' existence, the discrimination against share drafts feared by plaintiffs has been entirely lawful, but has not occurred.

In order to satisfy the injury requirement of standing, the plaintiffs need make "a credible allegation that plaintiff's course of behavior will be harmed" by the likely actions of third parties caused by this regulation. *Griles, supra,* 824 F.2d at 12. The Court is required to ascertain whether the response of depository institutions and credit union members will in turn affect the plaintiffs' intended behavior. *Id.* In this case, the plaintiffs have made a credible allegation that in the rough-and-tumble of competition between financial institutions, there is a sufficient threat of injury flowing from the regulation to credit unions that use nonlocal payable through banks to withstand a standing challenge. The regulation permits banks to treat payable through share drafts as nonlocal items, even though the credit union on which they are drawn is local to the bank. This in turn will permit the banks to impose longer holds on payable through share drafts, making them in all likelihood less desirable forms of payment. Further, in order to remain competitive with local banks, should Regulation CC remain in effect, plaintiff Dearborn has already determined the necessity of converting its share draft processing to an in-house operation, which will cause the nonprofit credit union to spend $300,000 that it otherwise would not have to spend.

The Court holds that the plaintiffs have made out sufficient allegations of threatened injury to withstand the motion to dismiss. The Board itself has acknowledged the potential for a lower level of acceptability of share drafts as a result of the regulation. *See* 53 Fed.Reg. 19,391. The potential harm to credit unions that use nonlocal payable through banks exists, in the threat of lost customers and the otherwise unnecessary expense of changing their processing methods. This threat of injury is not "unadorned speculation," *Simon v. Eastern Kentucky Welfare Rights Organiza-*

*tion,* 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976). Indeed, plaintiffs face a "realistic danger" of injury as a result of the regulation's implementation. *Pennell v. San Jose,* — U.S. —, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988).

### 2. Zone of Interests

■ Plaintiffs contend that their interests are also within the zone of interests to be protected by the Act. The Board does not challenge this assertion. The ABA suggests, however, that the injury threatened is not arguably within a zone of interests protected or regulated by the statute. The Bankers base their argument on the fact that the Expedited Funds Availability Act is narrow in scope and was consumer-driven in its inception. But the Act was passed as part of the Competitive Equality Banking Act of 1987, which clearly is broad in scope.

The ABA's argument must be rejected. The credit unions and other depository institutions arguably are the "subject of the contested regulatory action." *Clarke v. Securities Industry Association,* 479 U.S. 388, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). The credit unions' interests are not "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* The test for standing does not rely on whether the plaintiff was meant to benefit by the statute. No doubt, Congress intended consumers to benefit from the Act. But it is clear that the credit unions are arguably within the zone of interests to be regulated. *See American Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

### 3. Redressability

The Board contends that the plaintiffs lack standing because there is not a substantial likelihood that the requested relief will redress the plaintiffs' alleged injuries. The Board asserts that a declaration that payable through share drafts drawn on local credit union accounts must be treated as local checks will not necessarily prevent the loss of credit union share draft accounts feared by the credit unions. Instead, the Board suggests that the depository institutions will exercise their right to refuse to accept an item for deposit. *See* 12 U.S.C. § 4006(c)(2)(A) (stating that no provision of the Act may be construed as affecting a depository institution's right to reject a check for deposit).

■ Plaintiffs correctly assert that the defendant cannot defeat their standing by arguing that a second and different injury will befall the credit unions if the Court grants them their desired result. Furthermore, the language of the provision preserving banks' right to refuse to accept "a check" for deposit, 12 U.S.C. § 4006(c)(2)(A), suggests that it is designed to protect banks from having to receive noncollectible items. That provision cannot be used by banks to reject an entire class of items, such as all share drafts. Plaintiffs need only demonstrate a substantial likelihood that the threatened injury they allege will be redressed by the relief sought. *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631 n. 20, 57 L.Ed.2d 595 (1978); *Greater Tampa Chamber of Commerce v. Goldschmidt,* 627 F.2d 258, 265 (D.C.Cir.1980). The challenged regulation permits payable through share drafts to be treated as nonlocal items by banks otherwise local to the credit unions on which they are drawn. There is a substantial likelihood that a ruling that the nature of a payable through share draft must be determined by the location of the credit union on which it was drawn will redress the threatened injuries to the credit unions. For the foregoing reasons, the Court holds that plaintiffs have standing to challenge Regulation CC.

### B. *The Merits*

Turning to the merits of the case, we must begin with a comparison of the language in the Act with the challenged regulation. As stated previously, the time within which funds must be made available depends on whether the deposited check is local or nonlocal to the depository institution. In the Act, Congress defined the

"originating depository institution" as the branch of a depository institution on which a check is drawn. 12 U.S.C. § 4001(17). The Board has ignored and abandoned the statutory term, substituting its own term, "paying bank," and giving that term its own definition.[8] As a result, payable through share drafts may be treated as nonlocal items by a depository institution if the payable through bank is nonlocal, even if the credit union itself is local to the depository institution.

■ The first avenue of inquiry in a case of statutory construction is the language of the statute. If the language of the statute is plain and unambiguous, the Court's inquiry reaches a dead end, for the Court "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Moreover, if the statute is unambiguous, the deference traditionally accorded to agency interpretations will not come into play. *Id.* at 843, 104 S.Ct. at 2781.

■ In this case, the plain language of the Act dictates that the location of the institution on which a check is "drawn" determines whether it is local or nonlocal. The Board itself has acknowledged that at least in a technical sense the credit union is the originating depository institution on which a share draft is drawn. 53 Fed.Reg. 19,391. Furthermore, the Board is on the record as having referred to the credit union as the "organization on which a check is drawn" and the payable through bank as the place "where the check is sent for collection." 53 Fed.Reg. 47,113 (Dec. 11, 1987). The Board has now apparently concluded that the term "drawn" contains sufficient ambiguity as to warrant the change in terms. The alleged ambiguity is a fiction. The Board argues that the payable through bank performs many of the functions that might otherwise be performed by the credit union, making the payable through bank eligible for treatment as the institution on which a share draft is drawn. The fact remains, however, that it is the credit union that decides whether to pay or dishonor the share draft; the payable through bank is merely a collecting bank.

Common usage and commercial law provide a useful reference in determining the plain meaning of terms. In this case, both suggest that share drafts are never said to be drawn on or paid by the payable through bank. Under the Uniform Commercial Code, the "drawee" or "payor" institution is the one that holds the drawer's funds and which is requested to pay an item upon proper presentment. *See* U.C.C. § 4–105 & Official Comment 2. As applied to credit union share drafts, the drawee institution is the credit union, which decides whether or not the share draft will be honored. Indeed, the Board does not dispute that the credit union is a drawee institution with regard to its share draft accounts. *See* 53 Fed.Reg. 19,392. The payable through bank merely serves as a collecting agent, not authorized to pay the item, but only to present the share draft to the credit union. *See* Section 3–120 of the Uniform Commercial Code; *see also* B. Clark, *supra,* at ¶ 10.9[1][a].

The Board does not dispute that commercial law, as reflected in the UCC, supports the contention that the credit union is a drawee institution. The Board suggests, however, that the creation of the term "paying bank" in the Board's Regulation J, which is not at issue in this case, provides the basis for an alternative meaning of the term "institution on which a check is drawn." Under Regulation J, payable through banks and banks on which checks are drawn are treated the same for purposes of collection. At the outset, the Court notes that the Board first raised this "Regulation J" argument in its papers in this case. Hence, the argument does not merit much credence, as it resembles a post hoc rationalization. Nonetheless, the Court will address the argument.

The Board argues that there is evidence in the structure of the Act that Congress intended to adopt the "federal law" term "paying bank" of Regulation J. It must be

---

**8.** *See supra* note 6.

noted, however, that although the term "paying bank" had been in existence for seven years at the time that Congress passed the Act, Congress did not choose to adopt the Board's terminology. In the context of credit union share drafts, the Board contends that Congress left a gap in the Act with respect to *nondepository* institutions that can only be cured by the substitution of "paying bank" as defined by the Board for "originating depository institution" as defined by Congress. The plaintiffs concur that the Act is unclear as to the treatment of drafts drawn on *nondepository* institutions, such as insurance companies. But plaintiffs are correct that any such gap does not extend to credit union share drafts, for credit unions are clearly *depository* institutions under the Act. *See* 12 U.S.C. § 4001(12).

As for common usage, even the dictionary definition relied on by the Board in creating the alleged ambiguity within the term "drawn" supports plaintiffs' contention that the plain meaning of the term involved in this case can only refer to the credit union. *Black's Law Dictionary* defines the drawee of a check is "the bank on which it is drawn" and the party "requested to pay the amount of money" stated in the check. *Black's Law Dictionary* 444 (5th ed. 1979). In the case of a credit union share draft, the institution on which it is drawn and which is requested to pay its stated amount can be none other than the credit union.

## IV. CONCLUSION

This case is reminiscent of the United States Supreme Court's recent rejection of the Board's redefinition of statutory terms defined within the Bank Holding Company Act. *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed. 2d 691 (1986). *Dimension* concerned "nonbank banks"—institutions that offer services similar to bank services—which much to the Board's dismay were not subject to the Board's regulation. The Board redefined the term "bank" in a manner contrary to the definition in the Bank Holding Act and the intent of Congress. *Id.* In a similar

vein, the Board in this case substituted its own term, "paying bank," in a manner contrary to the Expedited Funds Availability Act and the intent of Congress.

The Court need not inquire into the legislative history of the Expedited Funds Availability Act because the phrase "depository institution on which a check is drawn" is clear and unambiguous. The statutory term universally refers to the institution that decides whether to pay or dishonor the item presented. Congress has directly spoken to the issue at hand, thereby eliminating the need for further inquiry by the Court. The institution on which a share draft is drawn is unquestionably the credit union.

It is equally unnecessary for the Court to accord deference to the Board's substitution of terms and redefinition, as the original term of the statute is clear and unambiguous. As was the case in *Dimension*, no amount of agency expertise can make the term at issue—"depository institution on which a check is drawn"—mean what the Board would have it mean.

To summarize, the Court finds that the plaintiffs have made credible allegations of a threatened injury fairly traceable to Regulation CC as promulgated. The Court further finds that there is a substantial likelihood that an order favorable to the plaintiffs will redress the threatened injuries. Based upon the foregoing, the Court holds that plaintiffs have standing to challenge Regulation CC. The Court further holds that Regulation CC as promulgated veers dramatically from the clear and unambiguous intent of Congress. In the Act, Congress chose the term "originating depository institution" and gave that term an unambiguous definition. Neither the Court nor the Board can substitute its judgment or its own terms for the judgment and plain language of Congress.

## ORDER

Upon consideration of plaintiffs' motion for summary judgment, the defendant's motion to dismiss, or in the alternative, for summary judgment, the oppositions there-

to, the arguments of counsel in open court, and the entire record in this case, and for the reasons set forth in the accompanying memorandum, it is by the Court this 27th day of July, 1988,

ORDERED that plaintiffs' motion for summary judgment be, and hereby is, granted; and it is further

ORDERED that defendant's motion to dismiss, or in the alternative, for summary judgment be, and hereby is, denied; and it is further

ADJUDGED, DECLARED AND DE-CREED that the definition of "paying bank" proposed in Regulation CC, 53 Fed. Reg. 19,435 (May 27, 1988) (to be codified at 12 C.F.R. § 229.2(z)), be, and hereby is, vacated and set aside to the extent that it defines "paying bank" to mean a depository institution other than the credit union on which a share draft is drawn.