The UNION NATIONAL BANK
OF TEXAS, Plaintiff,

v.

Maria de Jesus ORNELAS–GUTIERREZ,
et al., Defendants.

Civ. A. No. L–90–129.

United States District Court,
S.D. Texas,
Laredo Division.

July 5, 1991.

Horace C. Hall, III, Laredo, Tex., for defendant Maria de Jesus Ornelas–Gutierrez.

Richard E. Sames, Laredo, Tex., for defendant Maria Aurora Tenorio–Ornelas.

Richard N. Hansen, Laredo, Tex., for defendant Enrique R. Cuellar.

## MEMORANDUM AND ORDER

KAZEN, District Judge.

Pending are the Joint Motion for Summary Judgement of Defendants Maria de Jesus Ornelas–Gutierrez and Maria Aurora Tenorio–Ornelas (Joint Claimants) and the Motion for Summary Judgment of Defendant Enrique R. Cuellar, temporary administrator of the estate of Joaquin Felipe Gutierrez Gonzalez, deceased (Cuellar). This action arose when Plaintiff Union National Bank of Texas (UNB) deposited the disputed res with this Court and interpled the above parties who possess conflicting claims to it. The Court has reviewed the motions, all supplements and briefs, and the supporting affidavits and deposition transcripts filed by the parties.[1]

*Factual background.* There is fairly broad agreement among the parties as to the facts of this case. In late 1984, Joaquin Felipe Gutierrez Gonzalez (Don Joaquin), a Mexican national, opened a "money market" account (# 96–760–2) with UNB. Later, in January, 1985, through the services of UNB, Don Joaquin invested approximately $5 million (U.S.) in certificates of deposit from Allied Bank of Texas. This investment was given the identification number 100–155 in the records of UNB. In August, 1985, Don Joaquin reinvested these funds in "book-entry" United States Treasury Bills (T-bills), using UNB as his broker in the purchase. The book-entry T-bills were purchased by Don Joaquin in the following manner. Don Joaquin gave UNB

Franciso R. Canseco, Laredo, Tex., for plaintiff Union Nat. Bank of Texas.

1. A recent skirmish has developed over Cuellar's tendering the affidavits of Thelma L. Wells and Stanley M. Johanson as summary judgment evidence. The Joint Claimants urge that the affidavits be stricken as merely stating legal conclusions. That contention is probably correct. However, these documents basically just restate arguments made in several briefs filed by Cuellar and no useful purpose would be accomplished by purporting to strike them after they have been read by the Court.

the funds for purchasing the T-bills. UNB in turn purchased the T-bills from the Federal Reserve Bank in San Antonio, and the T-bills were held for Don Joaquin in UNB's T-bill account at the Federal Reserve Bank. To keep track of these uncertificated T-bills, UNB continued to use identification number 100–155 for the T-bills held in San Antonio for Don Joaquin. For this service, UNB charged Don Joaquin its standard $50.00 brokerage and custodial fee. UNB gave Don Joaquin a receipt, signed by a UNB officer, that identified the number and denomination of T-bills held for him, the maturity date, his identification number, and other relevant data, including a CUSIP number specifically identifying the bills held on his behalf. On the back of the receipt, UNB stated the terms and conditions of its custodial agreement with the customer. Don Joaquin was not required to and did not sign the receipt.

Don Joaquin instructed UNB that the funds held in the T-bills should be automatically reinvested on his behalf when they reached maturity. He also directed UNB to sell off a portion of the T-bills, approximating the increase in their value, as they neared their maturity date. These proceeds were deposited in his money market account # 96–760–2.

This pattern of activity in his account continued until early 1988. On May 5, 1988, Don Joaquin came to the Laredo office of UNB and requested that the T-bill custodial agreement be altered to designate Maria Ornelas Gutierrez as a "pay on death" (P.O.D.) beneficiary of the T-bill investment. UNB officer Jorge Garza explained the significance of this change to Don Joaquin, wrote out and signed an altered safekeeping receipt reflecting the arrangement, and delivered it to Don Joaquin. Later in the year, Don Joaquin again came to. UNB's office and requested that Maria Tenorio Ornelas be added as a second P.O.D. beneficiary of the investment. The same process was followed, and the November 3, 1988 reinvestment receipt reflected this alteration.

On April 18, 1989, Don Joaquin died. UNB continued to reinvest the T-bill funds, delivering the receipts to Maria Ornelas Gutierrez and depositing the proceeds of the partial sales to the money market account. On December 6, 1989, Ornelas Gutierrez presented legal proof of Don Joaquin's death to UNB and directed that the T-bills be sold and the proceeds invested in United States Government securities under a repurchase agreement with UNB. UNB complied. The repurchase agreement is the disputed res held in the registry of this Court.

■ *The Issue.* Cuellar claims that the P.O.D. designation was inadequate as a matter of law and that the T-bills are the property of the decedent's estate. The Joint Claimants assert that they are entitled to the T-bills, exclusive of the estate, by reason of the P.O.D. designation. Defendant Cuellar argues that the T-bills were in a "P.O.D. account" with UNB, designated # 100–155, and that the validity of the P.O.D. designation is therefore governed by § 439 of Chapter XI of the Texas Probate Code, which regulates non-testamentary transfers of property. Tex.Prob. Code Ann. §§ 436–462 (Vernon 1980). More precisely, Cuellar contends that creation of a "P.O.D. account" under § 439(b) is controlled by the provisions of § 439(a) and thus, like the creation of a survivorship right in a "joint account," requires a writing and the signature of the deceased. *See Stauffer v. Henderson,* 801 S.W.2d 858, 862–63 (Tex.1990). This position is not entirely sound. Only subsection (a) of § 439 speaks of a writing signed by the decedent, and that subsection only applies to a "joint account." Under the definition in § 436(4) of the Code, # 100–155 was never a "joint account." It was never payable "on request to one or more of two or more parties." During the life of Don Joaquin, he was the sole owner of the T-bills. The Court concludes that # 100–155 was not directly controlled by § 439(a) of the Code. Nevertheless, if # 100–155 was an "account" under § 436(1), then it could not be changed to a P.O.D. account without a written order signed by Don Joaquin, because of the provisions of § 440 of the Code. The Joint Claimants assert that # 100–155 was not an "account" but rather

the identification number of a brokerage-custodial contract with a P.O.D. designation. Such an agreement would fall within the ambit of § 450 of the Code, governing nontestamentary transfers outside of "multiple-party accounts." Section 450, unlike § 439(a) and § 440, does not expressly require that a P.O.D. designation be signed by the party who dies.

■ *Definition of "Account".* The application of § 440 or § 450, therefore, depends on whether # 100–155 is an "account" under Chapter XI of the Probate Code. Section 436(1) of the Code states that:

'Account' means a contract of deposit of funds between a depositor and a financial institution, and includes a checking account, savings account, certificate of deposit, share account, and other like arrangement.

There is scarce guidance as to the precise scope of this definition. It is identical to the language of § 6–101 of the Uniform Probate Code; unfortunately, that code provides no notes or historical data elaborating on the textual definition of "account." Similar language is used to define "account" in Article 4 of the Uniform Commercial Code, U.C.C. § 4–104(1)(a) (1978), and the Texas Business and Commerce Code, Tex.Bus. & Com.Code Ann. § 4.104(a)(1) (Vernon 1968). Again, neither code provides further assistance in analyzing the definition.

The language of the definition suggests that the legislature intended to describe the typical debtor-creditor relationships established between banks and their customers when customers' funds are deposited, becoming an asset of the bank and creating a debt in favor of the customer. *See* 9 TEX. JUR.3d *Banks and Other Financial Institutions* § 153 (1980); 10 AM.JUR.2d *Banks* § 339 (1963).

Cuellar notes the existence of a signature card signed by Don Joaquin and suggests that it evidences a potential agreement between Don Joaquin and UNB for account # 100–155. That signature card has no P.O.D. designation. The summary judgment evidence refutes the contention that the T-bill arrangement was controlled by this signature card. The signature card in question is, save for Don Joaquin's signatures, completely blank—no date, no account number, no notations. The affidavits and deposition testimony of three UNB officers, who either worked directly on Don Joaquin's account or were employed at UNB at the relevant times, indicate that the blank signature card was unknown to them and unrelated to "account # 100–155." Deposition of Rafael Gutierrez, pp. 40–42, Joint Motion for Summary Judgment (Joint Motion), Exhibit A; Affidavit of Jorge Garza, p. 4, Joint Motion, Exhibit B; Affidavit of Gerardo Gonzalez, p. 2, Joint Motion, Exhibit C. They testify that a signature card was not used at that time in performing "investment" services for bank customers, such as purchasing and acting as custodian for T-bills; instead, the receipt for such a transaction was sufficient and was the sole evidence of the transaction and nature of the holding. *See, e.g.,* Affidavit of Gerardo Gonzalez, p. 7, Joint Motion, Exhibit C; *see also* Affidavit of George Berry, Joint Motion, Exhibit D (use of receipt as record of book-entry T-bill transactions, without signature card, is a common banking practice in Texas). The only summary judgment evidence that possibly ties the blank signature card to "account # 100–155" comes from Albert Cavazos, an employee of UNB and custodian of files relevant to this case. Cavazos refers to the investment transactions in T-bills as occurring in "account # 100–155" and first opined that the blank signature card applied to that "account." Deposition of Albert Cavazos, pp. 13, 17, Response to Joint Motion, Exhibit A. However, Cavazos is only the custodian of the file and was not employed at UNB at the time of the disputed transactions. Moreover, later in his deposition, Cavazos stated that he was "unsure" what account the card refers to and that it would be impossible to ascertain that information from the face of the card. *Id.* at 20. On this record, no reasonable fact-finder could conclude that the uncompleted signature card applied to the T-bill arrangement.

In typical debtor-creditor relations between a bank and its depositors, deposited funds become assets of the bank and are carried on its books. *See supra.* The funds invested on Don Joaquin's behalf and the T-bills purchased for him did not become part of the assets and liabilities of UNB. Affidavit of Gerardo Gonzalez, p. 2, Joint Motion, Exhibit C.

The Joint Claimants' characterization of the investment transactions gains force when one considers the federal regulations governing the purchase of book-entry T-bills by banks on behalf of their customers. Part 350 of Title 31 of the Code of Federal Regulations regulates the issuance of and transactions in book-entry T-bills. 31 C.F.R. § 350.0–.18 (1990). Subpart B specifically governs book-entry T-bills handled by individual Reserve Banks of the Federal Reserve System. 31 C.F.R. § 350.2–.6 (1990). Under § 350.6, Reserve Banks, such as the Federal Reserve Bank of San Antonio, are "authorized to maintain book-entry Treasury bills for member banks [such as UNB] for bills the member banks hold ... for the account of their customers...." 31 C.F.R. § 350.6(a)(1) (1990). Section 350.6 suggests that such book-entry accounts at Reserve Banks

> ... may be established in such form or forms as customarily permitted by the [member bank] maintaining them. The recommended identification for each such account would include data to permit both customer identification by name, address and taxpayer identifying number, as well as a determination of the Treasury bills being held in such account by amount, maturity date and CUSIP number, and of transactions relating thereto.

31 C.F.R. § 350.6(a)(2) (1990). In addition, Part 450 of Title 17 of the Code of Federal Regulations sets the requirements to be met by "depository institutions," such as UNB, acting as custodians of government securities held on behalf of customers. 17 C.F.R. § 450.1–.5 (1990). Under § 450.4(b), a bank acting as custodian for a customer's securities "shall issue a confirmation or a safekeeping receipt for each security held ... [which] shall identify the issuer, maturity date, par amount and coupon rate of the security being confirmed. The confirmation may be supplied to the customer in any manner that complies with applicable Federal banking regulations." 17 C.F.R. § 450.4(b)(1) (1990). This regulatory scheme, examined along with the testimony of the UNB officers, points to the conclusion that the investment by UNB in book-entry T-bills on behalf of Don Joaquin was not an "account" as defined under § 436(1) of the Texas Probate Code, but rather was a brokerage-custodial agreement between UNB and Don Joaquin.

■ *Applicability of § 450.* Under § 450(a)(3) of the Probate Code, a provision in certain instruments to the effect that the property which is the subject of the instrument shall pass to a person designated by a decedent in the instrument shall be deemed non-testamentary and not be considered invalid under the Code. Several types of instruments are specifically mentioned, including insurance policies, employment contracts, bonds, mortgages, and promissory notes. That section also specifies a "deposit agreement," a "custodial agreement," and "any other written instrument effective as a contract." None of the listed categories are defined. The Court concludes that the several receipts issued by UNB to Don Joaquin as evidence of his purchased T-bills would fairly fit within the category of either a "deposit agreement" or a "custodial agreement." Moreover, under Texas law, the receipt would also constitute a "written instrument effective as a contract."

■ It is well settled in Texas law that, where a writing is signed by one party and the other party, though not signing the writing, acts upon, acquiesces in, or accepts the benefits of the agreement, a written contract binding on both parties is formed. *See, e.g., Augusta Dev. Co. v. Fish Oil Well Serv.,* 761 S.W.2d 538, 544 (Tex. App.—Corpus Christi, 1988, no writ); *Rubin v. Polunsky,* 366 S.W.2d 234, 236 (Tex.Civ.App.—San Antonio, 1963, writ ref'd n.r.e.); *Dowdell v. Ginsberg,* 244 S.W.2d 265, 266 (Tex.Civ.App.—Fort Worth, 1951, no writ); *see also Dickerson v. Brooks,* 727 S.W.2d 652, 654 (Tex.App.—

Houston [1st Dist., 1987], writ ref'd n.r.e.). This same principle has been declared applicable to an *ex parte* receipt. *See, Cox v. Jasper,* 97 S.W.2d 530, 531 (Tex.Civ.App.—Amarillo, 1936, no writ); 14 TEX.JUR.3d, *Contracts,* § 44 (1981). While Don Joaquin did not sign the receipts forming the basis of the brokerage and custodial agreement with UNB, he did acquiesce in and accept the benefits of them.

■ A closer question is whether the receipts named a person "designated by the decedent" to receive property upon his death. The undisputed summary judgment evidence is that the P.O.D. designation was added at the specific request of Don Joaquin, witnessed by several persons. Cuellar does not contest this evidence. Instead he points to the strong Texas policy of requiring a signature by the decedent in § 439(a) and suggests that it would be contrary to that policy to allow transfer of a large sum of money on a decedent's "oral instructions." The fact is, however, that §§ 439(a) and 440 explicitly require the signature of the decedent while § 450 does not. This indicates, at least, that the Texas Legislature knows how to require the signature of the decedent if it wishes to do so. Moreover, as stated in *Stauffer v. Henderson, supra,* there could be policy reasons why the legislature might require stricter standards for creating survivorship rights in a joint account. Persons have "very different reasons … for opening joint accounts. It is not at all unusual for a person to deposit his or her funds into an account upon which another person is authorized to draw merely for the convenience of the depositor. The owner of the money intends only to facilitate disbursement of the funds for his or her own purposes, not to transfer title to the co-signator on the account." *Stauffer,* 801 S.W.2d at 861. Moreover, this Court is not writing on a clean slate. In a diversity case, this Court is required to follow Texas law as best as it can be ascertained from state legislation or court opinions. There is almost none of either such authority on this point. However, in *Dickerson v. Brooks,* 727 S.W.2d 652, 654 (Tex.App.—Houston [1st Dist.], 1987, writ ref'd n.r.e.), the court applied § 450 to a promissory note payable to the decedent but not signed by her. The note provided, among other things, that in the event of the payee's death, the note was payable to two of her named heirs. The court observed that § 450 of the Texas Probate Code was "almost identical" to § 6-201 of the Uniform Probate Code (1969). It then held:

"The language of section 450(a) and the comment to section 6-201 indicate that such transactions are to be considered non-testamentary and that a signature of the decedent on the note indicating a testamentary intent is not necessary."

*Id.* at 654. Absent any contrary indication of Texas law, the Court must accept that proposition as binding. So doing, the Court observes that the result is not nearly as ominous as Cuellar suggests. Section 450 certainly does not prohibit the signature of the decedent and obviously a well-advised person would want to sign a § 450 provision simply to avoid this type of litigation. Further if there were any legitimate doubt that the decedent had actually designated a certain person to receive property upon his death, the issue would be tried like any other. In this case, however, there appears to be no legitimate doubt as to what Don Joaquin intended. That has been established through the uncontroverted testimony of bank employees who presumably have no reason to favor one claimant over the other. Cuellar is instead proposing a rule that would negate Don Joaquin's intent as a matter of law. The Court concludes that such a rule is not applicable in this case.

■ Cuellar also makes the curious argument that the receipt itself precludes a P.O.D. disposition. Printed near the top of each receipt was this phrase: "Not transferable by negotiation, assignment or otherwise." Cuellar contends that this language somehow supersedes an explicit P.O.D. designation typed on the face of the receipt. The Court must attempt to read any instrument in a manner which would avoid a nonsensical result. It would surely be nonsensical for UNB to create a document that in almost the same physical

location provides for a payment on death but then cancels that designation by providing for non-transferability. The court must conclude that the receipt was non-transferable only beyond the terms contained on its face.

 Cuellar contends that the federal regulations governing Treasury bills invalidate the P.O.D. designation on the T-bills in question. Cuellar relies upon § 350.7(b)(1) of Title 31 of the Code of Federal Regulations which limits the "recordation" of book-entry T-bills to two forms, in one name *or* in two names. 31 C.F.R. § 350.-7(b)(1) (1990). He argues that the designation of two P.O.D. beneficiaries along with Don Joaquin violates this regulation. Cuellar's position is without merit. Section 350.7 is included in Subpart C of Part 350. Subpart C specifically regulates book-entry T-bills issued directly by the U.S. Department of the Treasury. The T-bills here were purchased by a member bank of the Federal Reserve System, UNB, for one of its customers, from a Federal Reserve Branch Bank. Such a transaction is clearly governed by Subpart B of Part 350. Under § 350.6 of Subpart B, the identification of T-bill accounts held on behalf of the member bank's customers is expressly left up to the member bank and "may be established in such form ... as customarily permitted by the [member bank]." 31 C.F.R. § 350.-6(a)(2) (1990).[2]

*Conclusion.* The P.O.D. designation on the last receipt issued to Don Joaquin by UNB is valid under § 450 of the Probate Code. Joint Claimants are GRANTED summary judgment. Cuellar's motion is DENIED. All parties are DIRECTED to confer forthwith to agree on the form of a judgment which should be filed no later than July 19, 1991. If agreement cannot be reached, the parties shall advise Courtroom Deputy Clerk Rosaura Rodriguez and a hearing shall be set.

---

**2.** Joint Claimants cite various federal regulations which they argue would uphold their P.O.D. designation under federal law. Extensive treatment of these arguments is unwarranted in view of the Court's holding under § 450 of the Probate Code. It suffices to note that these regulations are a hodge-podge of contradictory directives that alternatively allow and forbid P.O.D. designations depending on the type of federal security instrument involved. None of them could be cogently read to override the treatment of uncertificated book-entry T-bills issued by Federal Reserve Branch Banks under 31 C.F.R. § 350.6.