J-S58020-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: HOWARD F. MILLER, DECEASED, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: GEOFFREY G. MILLER AND HUNTLEY H. MILLER | |
| | No. 312 MDA 2017 |

Appeal from the Order Entered January 19, 2017
In the Court of Common Pleas of Cumberland County
Orphans' Court at No(s): 21-14-0822

BEFORE:  GANTMAN, P.J., SHOGAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SHOGAN, J.:               **FILED NOVEMBER 06, 2017**

Geoffrey G. Miller ("Geoff") and Huntley H. Miller ("Chet") (collectively, "the brothers") appeal the order granting the petition filed by Renee E. Andwood ("Renee") and Karen M. Blackbird ("Karen") (collectively, "the sisters").  We reverse.

The parties entered a Joint Stipulation of Facts ("stipulated facts"):

A. BACKGROUND FACTS

1.  Prior to August 18, 2008, Howard F. Miller and Marguerite E. Miller owned, as husband and wife, a parcel of real estate, consisting of approximately 135 acres in Dickinson Township, Cumberland County, commonly referred to as 134 N. Dickinson School Road, Carlisle, Pennsylvania, on which they had their family homestead ("Miller Family Homestead").

2.  By Deed dated August 18, 2008, Howard F. Miller ("Father") and Marguerite E. Miller ("Mother") transferred the Miller

Family Homestead to themselves and to their four children, Geoffrey G. Miller ("Geoff"); Huntley H. Miller ("Chet"); Renee E. Andwood ("Renee") and Karen M. Blackbird ("Karen") as joint tenants with right of survivorship.

3. The August 18, 2008 Deed was signed by Geoff on behalf of Father and by Chet on behalf of Mother, both as Powers of Attorneys ("POAs") for each respective Grantor.

4. On March 26, 2009, Father executed a new Power of Attorney ("POA") prepared by Hazen Elder Law, whereby Father appointed Geoff, Chet and Karen [as] his POAs to act "jointly or individually" as his co-agents.

5. On November 9, 2011, Father executed another Power of Attorney prepared by Hazen Elder Law, naming all four (4) siblings as co-agents.

6. Mother passed away on June 25, 2011.

7. At the time that Mother passed away, Father and Mother had joint (husband and wife) accounts at both M&T Bank and Citizens Bank. M&T Bank had a money market account. Citizens Bank had checking, savings and Certificates of Deposit.

8. Upon Mother's death, Father received and [sic] annuity worth approximately $187,000.00, for which Geoff, as Father's POA, accepted the death benefit from Trans America Insurance Company, opened an account at M&T Bank in Father's name only and deposited the policy proceeds into said account, which was in Father's name even at the time of his death.

9. Father died on August 21, 2014 leaving a Will dated May 9, 2009....

10. Father's May 9, 2009 Will was admitted to probate on September 3, 2014 and Geoff and Chet were granted Letters Testamentary on that same date.

11. At the time of Father's death, on August 21, 2014, the value of the account funded with Mother's annuity was $188,419.63, which amount was transferred on September

10, 2014, by Co-Executor, Geoff Miller into the Howard Miller Estate Account . . . at M&T Bank ("Estate Account").

B.    MILLER FAMILY HOMESTEAD FARMING OPERATION

12.  Father and Geoff had farmed the Miller Family Homestead together since 1997, when Geoff retired from the Pennsylvania State Police.

13.  Chet joined Father and Geoff to farm the Miller Family Homestead in 2009 after Chet retired from Fry Communications in Mechanicsburg, Pennsylvania.

14.  Once Chet and Geoff joined Father's farm business, the Millers ([Father], Chet and Geoff) farmed the Miller Family Homestead in conjunction with a local farmer, Mr. Widders. Among other expenses, the Millers provided the land, the seed, the fertilizer and paid to truck the produce to market and Mr. Widders supplied the farm equipment and the manpower to operate it ("Farming Operation").

15.  Revenues from the Farming Operation where historically deposited into Father's and Mother's joint checking account at Citizens Bank and Farming Operation expenses were historically paid from the same account, with Father and Mother itemizing the Farming Operation as Schedule "F" on their personal income tax returns.

16.  In or around February 2012, (after Mother's passing) certain Certificates of Deposit ("CDs"), having a value of about $70,000, in Father's account at Citizens Bank, were due to soon mature.

17.  Father's Citizens Bank account was the account into which Father's Social Security and retirement were automatically deposited monthly.

18.  In February 2012, Geoff as Father's POA, took $70,000.00 from the maturing CDs and $30,000.00 from Father's Citizens Bank account and opened an account at M&T Bank for the Farming Operation ("Farm Account").

19.  Geoff and Chet assert that Father agreed to open the Farm Account so that Geoff and Chet could continue the Farming

Operation after his death as it had been conducted for years. Karen and Renee disagree with this assertion.

20. Said Farm Account had both a "Power Money Market" component, . . . and a "My Choice Premium Checking" component. . . .

21. The Farm Account was opened with a deposit of $100,000.00 on February 8, 2012 as a joint account with right of survivorship between Father, Geoff and Chet.

22. Geoff signed as POA for Father to open the Farm Account since Father was residing with his Daughter Karen, in Elizabethtown at the time the Farm Account was opened because the siblings did not want Father living in the Homestead during the winter by himself.

23. After Father's death on August 21, 2014, the Farm Account was retitled to Geoff and Chet as joint tenants with right of survivorship.

24. Once the Miller Family Homestead was transferred in 2008 to Father, Mother and the four siblings (Geoff, Chet, Renee and Karen), the four siblings all agree that each was initially legally responsible for 1/5 of all real estate taxes, insurances, maintenance, upkeep and repairs for the Miller Family Homestead and once Father and Mother passed away, that the four (4) siblings were legally responsible to share equally (1/4 each) those same expenses/types of expenses.

25. Starting on November 1, 2011, after Mother had passed away, Father gifted equally $6000 to each sibling from the Citizens Bank Account.

26. On May 30, 2012, Father gifted another $6000 to each of the four siblings from his Citizens Bank Account, totaling gifts of $48,000.

27. In 2013, Father again expressed his desire to make additional gifts of $6000 each to the four siblings.

28. In 2013 and 2014, Father, through Geoff, gifted to Geoff, Chet, Karen and Renee gifts from the Farm Account, rather

than from the Citizens Bank Account to avoid depleting the Citizen's Bank account from which expenses for Father's care were being paid. The gifts to each sibling totaled $12,000.00.

29. Although the Farm Account was titled jointly with right of survivorship between Father, Geoff and Chet, the Co-Executors, transferred 1/3 of the date of death value ($23,840.58) of the Farm Account to Father's Estate Account on September 24, 2014.

30. The $23,840.58 deposited from the Farm Account into the Estate Checking Account on September 24, 2014 was comprised of a $10,181.65 withdrawal from the Farm Account Money Market and a $13,648.93 withdrawal from the farm Checking Account (total $23,840.48) for which M&T issued a bank check . . . to transfer the money to the Estate Checking account. All of these transactions are documented on the true and correct Farm Account Statements from M&T Bank, dated September 9, 2014 to October 8, 2014.

31. The date of death value of the Farm account was $71,522.35 reflecting $40,976.65 in the checking account and $30,545.70 in the money market account.

32. In 2015, the siblings executed a Deed dated December 8, 2015, by which ownership of the Miller Family Homestead was changed to tenants in common among the four (4) siblings, rather than joint tenants with right of survivorship.

33. By mutual agreement, the partition action filed by Karen and Renee, docketed in the Cumberland County Court of Common Pleas, at docket number 2016-00486-Civil has been indefinitely stayed and the parties have agreed to amicably partition the Miller Family Homestead.

34. On October 31, 2016, Geoff wrote check #125 to transfer $23,840.38 from Father's Estate Account to be held in escrow by the Law Offices of Peter J. Russo, P.C. until such time as ownership of the Farm Account (from which the $23,840.38 had been transferred into Fathers' [sic] Estate checking account) has been resolved.

35. Several distributions from Father's Estate checking account have been made to the beneficiaries by the Co-Executors. Such distributions are:

a. Checks #0108, 0107, 0105 and 0106 all for $20,000.00 each, payable to the four (4) siblings in September 2014; and

b. Checks #0134, 0133, 0132, and 0131 all for $25,000.00 made payable to Geoff, [Chet], Karen and Renee respectively in December 2014.

36. Geoff filed the original Revenue 1500 for Father's Estate....

37. Geoff filed a Supplemental Revenue 1500 for Father's Estate dated July 28, 2015....

38. Geoff filed a second Supplemental Revenue 1500 for Father's Estate dated February 4, 2016....

39. The Pennsylvania Department of Revenue accepted "as filed" the February 4, 2016, Revenue 1500 on July 1, 2016, as a result of which the estate had a credit of $817.52.

40. Geoff filed a third Supplemental Revenue 1500 for Father's Estate dated October 26, 2016, and paid tax due of $6,944.98 (after taking the $817.52 credit), as a result of losing the farming exemption since the siblings have agreed that the Miller Family Homestead is to be partitioned.

41. From 2008 forward, Mother and Father were represented by Hazen Law, a law firm that focuses on elder law, which firm was selected by Karen.

42. All of the siblings participated (in person or by conference call) in all of the meetings between Father, Mother and estate planning counsel.

Stipulated Facts, 12/30/16 (internal citations omitted).

The sisters filed a "Petition to Show Cause Why an Account Should Not

Be Filed in Accordance with 20 Pa. C.S.A. §3501.1" ("Petition"), averring

that the brothers opened a joint account ("Farm Account") with Father that should be included in Father's estate. Petition, 1/27/16, at ¶¶ 6, 7. With leave of court, the brothers filed an answer *nunc pro tunc* ("Answer"), asserting they own the Farm Account through statutory survivorship. Answer, 3/14/16, at ¶¶ 6, 7.

Upon consideration of the Petition, the Answer, and submitted legal memoranda, the orphans' court granted the Petition and ordered that the brothers "are to file an accounting with the Farm Account . . . being included as part of [Father's] estate, and that the Farm Account will not transfer to Geoff and Chet as joint tenants with right of survivorship." Opinion and Order, 1/19/17, at 7.[1] This appeal followed. The brothers and the orphans' court have complied with Pa.R.A.P. 1925.

The brothers state the following questions for our consideration:

1. Did the Orphans' Court err by failing to consider the Multi-Party Account[s] Act, 20 Pa.C.S.A. § 6301 *et seq.,* ("MPAA"), and the Pennsylvania Supreme Court's Decision *In re Novosielski Estate*, 605 Pa. 508, 992 A.2d 89 (2010) when deciding ownership of the jointly owned M&T Bank Account Nos. 15004225781639 and 9856467452 (known as the Farm Account)?

2. Assuming, *arguendo*, that the MPAA and *Novosielski*, *supra*, are not controlling, did the [c]ourt err by failing to conduct any analysis whether the alleged "gift" of the initial deposit of

---

[1] We have jurisdiction over this appeal pursuant to Pa.R.A.P. 342(a)(6) ("An appeal may be taken as of right from the following orders of the Orphans' Court Division: . . . (6) An order determining an interest in real or personal property....").

- 7 -

$100,000.00 met the requirements for an "intervivos gift" by [Father] or the Co-Executors?

3. Did the Orphans' Court err by holding, "The establishment of the Farm Account must fail, even if it is not a gift, as an improper commingling of assets, and not reflective of Father's intent," when that conclusion is not supported by the only facts of record (the JSF) [Jointly Stipulated Facts], by citation to any applicable legal authority, by applicable precedent of the MPAA and *Novosielski*, *supra* and/or by the entirety of the language of the 2011 POA or [Father's] Will?

4. Did the [c]ourt err by drawing inferences and factual conclusions that were not supported by the Jointly Stipulated Facts, which constituted the only record before the Court?

5. Did the [c]ourt err by failing to analyze the relevant provisions of Father's Will in conjunction with the holding in *Novosielski*, *supra* and the MPAA and by ignoring other provisions of Father's 2011 POA and his Will that further demonstrated Father's intent respecting the jointly owned Farm Account and the Farming Operation?

6. Did the Orphans' Court err by ordering an accounting as no party had requested that relief when the [c]ourt was asked to decide the sole question of the ownership of the jointly owned Farm Account and by so [o]rdering, the Orphans' Court imposed unintended and potentially adverse consequences upon [Father's] Estate (this error is currently mooted by entry of the Orphans' Court Order dated March 15, 2017 which rescinded that portion of the January 19, 2017 Order that directed the [brothers] to file an accounting, provided that the Orphans' Court retained jurisdiction to enter said March 15, 2017 Order)?[1]

> [1] This issue is being preserved in the event that the Superior Court would hold that the Orphans' Court lacked jurisdiction to enter the March 15, 2017 Order. But to conserve private and judicial resources, it is not briefed herein as it is currently moot, unless resurrected by the Superior Court, in which case the [brothers] will brief (or argue) the issue, if requested to do so by the Superior Court.

The Brothers' Brief at 5–7 (reordered for ease of disposition).[2]

Our standard of review from a final order of the orphans' court is deferential:

> We accord the findings of the Orphans' Court, sitting without a jury, the same weight and effect as the verdict of a jury; we will not disturb those findings absent manifest error; as an appellate court we can modify an Orphans' Court decree only if the findings upon which the decree rests are not supported by competent or adequate evidence or if there has been an error of law, an abuse of discretion, or a capricious disbelief of competent evidence.
>
> Moreover, we will not reverse the Orphans' Court's credibility determinations absent an abuse of the court's discretion as factfinder. On the other hand, we are not required to give the same deference to the Orphans' Court's legal conclusions. Where the rules of law on which the Orphans' Court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

*Estate of Edward Winslow Taylor Inter Vivos Tr.*, ___ A.3d. ___, 2017 PA Super 275, *5 (Pa. Super. filed Aug. 23, 2017) (quoting *In re Trust of Hirt*, 832 A.2d 438, 447 (Pa. Super. 2003) (citations, quotation marks, and some brackets omitted)); *In re Fiedler*, 132 A.3d 1010 (Pa. Super. 2016) (*en banc*), *appeal denied*, 145 A.3d 166 (Pa. 2016).

---

[2] We note that the brothers' brief does not comport with our rules of appellate procedure in that the argument section is not "divided into as many parts as there are questions to be argued." Pa.R.A.P. 2119(a). Because this defect does not substantially hamper our review, we shall address the issues presented in our discussion. However, the orphans' court did not address and the parties did not brief the brothers' final issue; therefore, we decline to conduct any analysis of it.

The brothers' first issue focuses on the orphans' court's treatment of the Multi-Party Accounts Act ("MPAA"), 20 Pa.C.S. §§ 6301–6306, and *In re Novosielski Estate*, 992 A.2d 89 (Pa. 2010), in determining ownership of the Farm Account. The MPAA provisions are "applicable solely to the determination of property rights among parties in regard to multiple-party accounts." 20 Pa.C.S. § 6302. Interpreting the MPAA, the Pennsylvania Supreme Court ruled in *Novosielski*, "The MPAA rather clearly evidences a legislative intent that, except when the instrument explicitly provides to the contrary or in the unusual case based on a heightened degree of evidence, individuals and institutions may safely rely upon the presumed right of survivorship of MPAA joint accounts." *Novosielski*, 992 A.2d at 91.[3]

The orphans' court did not discuss either authority in its January 19, 2017 opinion. In its supplemental opinion, the orphans' court stated:

> [The brothers] argue that the [c]ourt erred in failing to analyze or apply the [MPAA], 20 Pa. C.S. §6301, or the Pennsylvania Supreme Court decision in *In re Alice Novosielski*, 992 A.2d 89 (Pa. 2010)…. While the [c]ourt did not directly address either the MPAA or the *Novosielski* opinion, the [c]ourt does not believe that either is applicable to the present case. As noted in our January 19, 2017 opinion, we determined that the Power of Attorney is controlling, and the initial transfer of funds to the Farm Account was invalid, regardless of whether the transfer was or was not a gift; as a result, the holding of *Novosielski* is inapposite to the instant case.

---

[3] Applying the MPAA, the *Novosielski* Court ruled that a testatrix's will was not *per se* clear and convincing evidence that the testatrix had not intended to create a right of survivorship in a multiple party account. *Novosielski*, 992 A.2d at 107.

- 10 -

Orphans' Court Supplemental Opinion, 5/3/17, at 2. In sum, the orphans' court concluded that the Farm Account was not a legally created joint account; therefore, it declined to apply the MPAA and **Novosielski**.

Asserting that creation of the Farm Account was authorized under Father's 2011 power of attorney ("the 2011 POA"), the brothers argue that the orphans' court erred in failing to begin its analysis with consideration of the MPAA, "if for no other reason, than to establish who bore the burden of proving" ownership of the Farm Account and "by what standard." The Brothers' Brief at 28. According to the brothers, the MPAA creates a presumption of survivorship in their favor that "can be overcome only by clear and convincing evidence of contrary intent. The burden of establishing a contrary intent is on the party who opposes the presumption of survivorship." **Id.** at 29 (citing **In re Estate of Meyers**, 642 A.2d 525, 528 (Pa. Super. 1994)). The brothers complain that the orphans' court "never discussed the burden of proof required by the MPAA and, therefore, never analyzed whether the [s]isters had met the burden that was undoubtedly theirs according to the Statute…." **Id.** at 30.

In response, the sisters argue that the orphans' court properly began its analysis by examining the scope of powers Father granted his agents under the 2011 POA to determine if the Farm Account was legally created. The Sisters' Brief at 9. The sisters assert that, in analyzing the 2011 POA, the orphans' court properly found that the brothers acted without authority

in opening the Farm account. *Id.* at 13–17. Thus, the sisters contend that "a joint account was never created and the Orphans' Court correctly concluded that consideration of the MPAA and *Novosielski* was inapplicable." *Id.* at 17.

Upon review of the certified record, the MPAA, and ***Novosielski***, we discern no error in the orphans' court's analytical starting point. Common sense dictates that ownership of a joint account is dependent on the legitimate creation of a joint account. Indeed, application of the MPAA presumes a legitimately created joint account. ***See Novosielski***, 992 A.2d at 105–106 (explaining that **a legitimately created joint account** carries the statutory presumption of survivorship unless negated by the form of the account); ***see also In re Estate of Cella***, 12 A.3d 374, 380 (Pa. Super. 2010) (quoting ***Novosielski***). Also, ***Novosielski*** concerned the ownership of a legitimately created joint account, not the validity of a joint account.

The legitimate creation of the Farm Account depended on the scope of powers authorized by the 2011 POA. Thus, we approve of the orphans' court first reviewing the 2011 POA to determine if the brothers had authority thereunder to open the Farm Account. In light of the orphans' court's ruling that the Farm Account was not a legitimately created joint account, we discern no abuse of discretion or error of law in the orphans' court's initial rejection of the brothers' MPAA- and ***Novosielski***-based arguments.

The brothers also attack—as "further reversible error"—the orphans' court's principal holding that the initial transfer of funds into the Farm Account was invalid under the 2011 POA. The Brothers' Brief at 31–53. According to the brothers, they had authority under the 2011 POA to open the Farm Account, and therefore they own it by operation of the MPAA. *Id.* at 55.

Noting that powers of attorney are to be strictly construed, the orphans' court held as follows:

> In the present case, Section 5 of the [POA] states the siblings as co-agents have the power to "open and close checking, savings, transaction or other deposit accounts in Father's name." Exhibit C to Joint Stipulations, Section 5. Section 22 of the [POA] states that "**my Agents must act jointly, not individually, for all gifting**." Exhibit C to Joint Stipulations, Section 22 (emphasis in original). Section 23 further states that "my Agent and the donee of the gift shall be responsible as equity and justice may require to the extent that a gift made by my agent is inconsistent with my directions and planning of my probable intent with respect to the disposition of my estate." *Id.* Finally, Section 22 waives the general requirement that assets may not be commingled between the principal and co-agent, by stating "**I specifically and expressly waive any requirements in effect now and in the future to have my assets kept separate from my Agent's assets**." *Id.* (Emphasis in original).
>
> We agree with Karen and Renee that Geoff and Chet acted without legal authority under the [2011 POA] to open the Farm Account as a joint tenancy with right of survivorship. Ultimately, we conclude that it does not matter for purposes of this case whether or not the transfer of funds was a gift or not. If it was a gift, then all four siblings were required to agree to the transfer. Geoff and Chet contend that Karen and Renee did not dispute the opening of the account at that time and later received gifts from the account, thereby implicitly agreeing. However, neither the receipt of money from the account nor lack of protest does

not indicate acquiescence in this case. There are many reasons why Karen and Renee may not have objected at the time of the account's creation. For example, they may not have understood the implications of the joint tenancy or that Father intended the transfer to be a gift and not merely a means to keep Father's care expenses separate from farm expenses. The [2011 POA] states that the siblings must unanimously agree to a transaction involving a gift. The burden therefore is on Geoff and Chet to show that there was unanimous agreement, which, given Karen and Renee's objections, is not the case involving the Farm Account. The transfer must fail if it is considered a gift due to lack of unanimous consent.

If the transfer was *not* a gift, then the money was required to be kept separate as the [2011 POA] does not permit the commingling of assets between Father and the siblings, with the sole exception of a gift. The waiver of the commingling requirement is contained within Section 22 of the [2011 POA], which concerns gifts, but is not mentioned elsewhere. Moreover, the acknowledgement of the [2011 POA] signed by each sibling states that "I shall keep the assets of the principal separate from my assets (*except where a gift of assets may be titled jointly in the names of Principal and Agent*)." Exhibit C to [Stipulated Facts], Acknowledgement (emphasis added). The only reasonable interpretation of these two provisions, read together to give effect to both, is that the waiver is limited to gifts and is inapplicable to other types of transactions. Father may have wished to give the money to Geoff and Chet so that they could continue operating the farm upon Father's death. If this was in fact true, then Father should have amended his will to reflect this intent. If the intention was to separate farm expenses and revenue from Father's day-to-day care expenses, then the account should have been created in just Father's name. In that event, the siblings, with the [2011 POA], would have had the power to draw upon these funds as needed pursuant to Section 5 of the [2011 POA]. The clearest evidence of Father's intent is that he wanted all four siblings to agree as to the disposition of his estate, which was not done with the Farm Account. The establishment of the Farm Account must fail, even if it is not considered a gift, as an improper commingling of assets, and not reflective of Father's intent.

Consequently, we conclude that the establishment of the Farm Account was done without authorization under the [2011

POA], and therefore the transfer was invalid. The money in the account should properly be considered as part of Father's estate and should not have transferred to Geoff and Chet as joint tenants with the right of survivorship upon Father's death.

Orphans' Court Opinion, 1/19/17, at 5–6, 7.

In challenging the orphans' court's conclusion, the brothers raise multiple arguments. They complain that the orphans' court did not consider whether the initial $100,000.00 deposit into the Farm Account was an *inter vivos* gift. The Brothers' Brief at 51. The brothers further argue that:

the 2011 POA expressly granted very broad powers to Father's Co-Agents to "act jointly or individually. . .to transact all my business and to manage all my affairs as completely as . . . I myself might do, if personally present, including but not limited to, exercising the following powers contained in this document. That general grant of power was further expounded upon by [Father] in paragraph 27 of the 2011 POA, which provides in pertinent part, "The enumeration of the specific powers conferred herein shall not be deemed to exclude herein any other power, it being my purpose and intent to give my Agent power to do any and all things on my behalf as I could do myself". Obviously, Father could have opened the Farm Account himself.

*Id.* at 32 (emphasis and citations omitted). Additionally, the brothers point out that only the "gifting" provision of the 2011 POA requires all four co-agents to act jointly. *Id.* They emphasize that the orphans' court "discussed none of the broad grants of power given by [Father]," which "violates the principle that 'strict construction of powers of attorney does not militate against the existence of broad discretionary powers.'" *Id.* at 33 (citing ***Nuzum v. Spriggs***, 55 A.2d 402 (Pa. 1947)).

The brothers also claim that the orphans' court failed to consider additional provisions of the 2011 POA as determinative of Geoff's authority to open the Farm Account. The Brothers' Brief at 33–35 (citing ¶ 27, Conflicts of Interest and Waiver of Confidentiality; ¶ 14, Execution of Documents; ¶ 16, Receipts and Approvals of Accounts; and ¶ 20, Designate Beneficiaries). Moreover, the brothers contend, the orphans' court "improperly amended the language of the [2011] POA," by including a requirement that "a bank account could be opened ONLY in [Father's] name." *Id.* at 35.[4]

Furthermore, the brothers challenge the orphans' court's reasoning that "the establishment of the Farm Account must fail, even if it is not considered a gift, as an improper commingling of assets and not reflective of Father's intent." *Id.* at 41. Relying on ***Novosielski*** and the stipulated facts, the brothers contend that Father's testamentary intent was fulfilled in that (1) the bulk of Father's estate was distributed prior to his death by gifting and deeding the family homestead to the siblings, and (2) the residuary of Father's estate was distributed to the siblings pursuant to his will shortly after his death. "But, like the decedent in *Novosielski*, [Father] was certainly entitled to decide that the Farm Account should go to Geoff

---

[4] We note that, in the remainder of the brothers' arguments, they discuss the MPAA and other factors related to ownership of the Farm Account, not their authority under the 2011 POA to open the account. The Brothers' Brief at 36–41. Thus, that discussion is not germane to the issue at hand.

and Chet upon his death, as they had operated the family Farming Operation with him for many years." *Id.* at 50.

In contrast, the sisters start with the premise that the initial $100,000.00 deposit was a gift and a commingling of funds. The Sisters' Brief at 11, 13. They rely on the "very specific, consistent limiting language" of the 2011 POA in support of their position that "there is no authorization in the [2011 POA] for the titling of assets jointly in the name of Principal and Agent." *Id.* at 13. The sisters argue that Geoff was not authorized to open the Farm Account because he "acted individually and not jointly with the other agents," in violation of the gifting provision. *Id.* at 14 (citing 2011 POA, 11/9/11, at ¶ 22). The sisters also urge that the Farm Account is inconsistent with Father's "probable intent with respect to the disposition of his estate," because, "[i]n all matters he treated all four of his children equally." *Id.* at 14–15 (internal quotation marks and original brackets omitted). Lastly, the sisters argue that Paragraph 5 of the 2011 POA "did not give authority to Geoff and Chet to open the Farm Account. [Paragraph 5] authorizes an agent to open an account 'in my name.' It does not authorize the opening of an account in [Father's] name with others...." *Id.* at 16–17.

Upon review, we conclude that the brothers' arguments warrant relief. The orphans' court proposed that the initial $100,000 deposit would be invalid as a gift to the brothers. However, as the brothers observe, the

orphans' court conducted no analysis regarding the elements of an *inter vivos* gift.[5] The Brothers' Brief at 51–54; Orphans' Court Opinion, 1/19/17, at 4–7. Moreover, the record provides no basis for invalidating the Farm Account under the gifting provision of the 2011 POA.

The stipulated facts and supporting documentation indicate the following: Father and Geoff had farmed the Miller Homestead together since 1997, and Chet joined them in 2009. Stipulated Facts, 12/30/16, at ¶¶ 12, 13. After Mother passed and while Father was residing with Karen in Elizabethtown, Geoff opened the Farm Account as Father's agent, in Father's name, with Father's funds. *Id.* at ¶¶ 16, 18, 22, and Exhibit G. The Farm Account was opened "for the Farming Operation." *Id.* at ¶ 18. Father gifted the bulk of his personal assets equally to his four children on November 1, 2011, and in 2013 and 2014; those assets included the Miller Homestead and funds in Father's Citizens Bank Account. *Id.* at ¶¶ 24, 25, 26, 27, 28, and Exhibits I, K, and M. Moreover, as co-executors, the brothers made

---

[5] We have explained that:

> [a] valid inter vivos gift requires donative intent, delivery, and acceptance. There must be evidence of an intention to make a gift accompanied by delivery, actual or constructive, of a nature sufficient not only to divest the donor of all dominion over the property, but to invest the donee with complete control.

*In re Estate of Moskowitz*, 115 A.3d 372, 386 (Pa. Super. 2015), *appeal denied*, 130 A.3d 1291 (Pa. 2015) (internal quotation marks, brackets, and citations omitted).

several distributions from Father's estate to the siblings. *Id.* at ¶ 35. This evidence gives rise to a reasonable inference that Father distributed the bulk of his assets equally to his children through gifting and his will, but intended the brothers to use the Farm Account after his death for maintaining and continuing the family business they had been operating with Father for years.

Next, we address the orphans' court's implicit suggestion that the 2011 POA restricted the type of bank account Father's agent could open. The Pennsylvania Supreme Court has instructed:

> [P]owers of attorney are strictly construed and the grant of special powers is not to be enlarged unless this is clearly intended. Nevertheless, the rule of strict construction will not be allowed to defeat the very purpose of the agency, and where the agent has authority to exercise discretion his exercise thereof will bind the principal.

*Estate of Reifsneider*, 610 A.2d 958, 960 (Pa. 1992) (internal quotation marks, brackets, and citations omitted).

Here, the 2011 POA specifically authorized Father's agent to act individually in opening a bank account in Father's name **and** to do:

> **all other acts or things whatsoever, and to exercise all other powers on my behalf**, **whether or not referred to herein**, as fully as though herein specifically expressed, which **in the sole discretion of my Agent** may be deemed advisable to be done for me and in my name, as fully and completely as I might or could do personally, giving and granting to my Agent for that purpose **full and complete power and authority** to have, use and take all lawful means in my name for the purposes aforesaid. **The enumeration of the specific powers conferred herein shall not be deemed to exclude herein any other power, it being my purpose and intent to give**

> **my Agent power to do any and all things on my behalf as fully as I could do myself**. The descriptive headings of this general power of attorney are inserted for convenience only and shall not be deemed to affect the meaning or construction of any of the provision [sic] hereof or to limit in any way the construction thereof **in the broadest possible manner**.

2011 POA, 11/9/11, at Preamble and ¶¶ 5, 27 (emphases supplied).

Although the authority to open a joint bank account with right of survivorship was not referred to in the 2011 POA, Paragraph 27 gave Geoff, in his "sole discretion" as agent, "full and complete power and authority" to act on Father's behalf "as fully and completely as [Father] might or could do personally." 2011 POA, 11/9/11, at ¶ 27. Father might have or could have personally opened a joint account with right of survivorship in the brothers to assist them in continuing the family business after Father's death. Thus, the orphans' court's limited construction was erroneous because it disregarded the broad scope of powers set forth in the 2011 POA, as well as the grant of sole discretion, the disclaimer about specific powers, and Father's expressed intention that the 2011 POA be construed in the broadest possible manner. *Id.*

With limited analysis, the orphans' court determined that creation of the Farm Account resulted in an unauthorized commingling of funds. Orphans' Court Opinion, 1/19/17, at 5–7. Again, legal authority and the record at hand provide no support for this finding.

The MPAA provides that "[a] joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to

- 20 -

the sum on deposit, unless there is clear and convincing evidence of a different intent." 20 Pa.C.S.§ 6303(a). Our Supreme Court has explained:

> The theory behind the statute is that of ownership of the accounts attributable to the individual's respective deposits and withdrawals; "the right of survivorship which attaches unless negated by the form of the account really is a right to the values theretofore owned by another which the survivor receives for the first time at the death of the owner. That is to say, **the account operates as a valid disposition at death rather than as a present joint tenancy**."

*Estate of Cella*, 12 A.3d at 379 (quoting *Novosielski*, 992 A.2d at 105).

Moreover:

> [I]ike other testamentary devices, **creation of a joint account, without more, accomplishes no present transfer of title to property. If … one person deposits all sums in the joint account, this arrangement contemplates transfer of title to those funds to the other person or persons named on the account upon the death of the depositor**. Moreover, the creator of a joint account, like the maker of a will and unlike the giver of a gift, may change his or her mind prior to death.

*Novosielski*, 992 A.2d at 102 (quoting *Deutsch, Larrimore & Farnish, P.C. v. Johnson*, 848 A.2d 137, 143–144 (Pa. 2004)) (emphasis supplied).

Here, the siblings stipulated, "In February 2012, Geoff as father's POA, took $70,000.00 from [Father's] maturing CDs and $30,000.00 from Father's Citizens Bank account and opened an account at M&T Bank for the Farming Operation ("Farm Account")." Stipulated Facts, 12/30/16, at ¶ 18. Nowhere in the stipulated facts do the parties mention that the brothers deposited their own funds into the Farm Account or used the Farm Account for personal reasons; rather, the Farm Account was opened and used to

continue the operation of the family farming business. *Id.* at ¶ 18 and Exhibit J. Moreover, any funds withdrawn from the Farm Account and deposited into the brothers' personal accounts were gifts from Father during his lifetime, effectuated by Geoff and Karen as his agents. *Id.* at ¶¶ 27, 28, and Exhibit I. Because the initial deposit was comprised solely of Father's funds and there is no evidence of other funds being deposited into the Farm Account, the brothers had no ownership interest in the Farm Account during Father's lifetime. *Novosielski*, 992 A.2d at 102; *Deutsch*, 848 A.2d 143–144. Accordingly, the orphans' court erred in finding that the Farm Account was commingled funds.

Lastly, the orphans' court determined that the Farm Account was not reflective of Father's intent. Yet, the siblings stipulated:

15. Revenues from the Farming Operation were historically deposited into Father's and Mother's joint checking account at Citizens Bank and Farming Operation expenses were historically paid from the same account, with Father and Mother itemizing the Farm Operation as Schedule "F" on their personal income tax returns.

* * *

17. Father's Citizens Bank account was the account into which Father's Social Security and retirement were automatically deposited monthly.

18. In February 2012, Geoff as Father's POA, took $70,000.00 from the mature CDs and $30,000.00 from Father's Citizens Bank account and opened an account at M&T Bank for the Farming Operation ("Farm Account").

* * *

28.  In 2013 and 2014, Father, through Geoff, gifted to Geoff, Chet, Karen and Renee gifts from the Farm Account, rather than from the Citizens Bank Account to avoid depleting the Citizen's Bank account from which expenses for Father's care were being paid. . . .

Stipulated Facts, 12/30/16, at ¶¶ 15, 17, 18, 28.

These facts indicate that the Farm Account was created to support the Farming Operation, subsidize Father's gifting, and insulate Father's Citizens Bank account, which was used for his personal care.  Because the brothers actively participated in the farming operation with Father, the reasonable inference arises that the Farm Account was opened so the brothers could maintain and continue the family business after Father's death.  Nothing in the stipulated facts points to a contrary intent.  The sisters' claim that Father intended to distribute his assets equally among his children is not negated by creation of the Farm Account, which, the sisters stipulated, was created "for the Farming Operation."  Stipulated Facts, 12/30/16, at ¶ 18. Accordingly, the orphans' court's finding that creation of the Farm Account was not reflective of Father's intent is unsupported by the record.

Based on the foregoing, we hold that the orphans' court erred in concluding that the initial deposit of funds into the Farm Account was an unauthorized exercise of authority and, therefore, invalid.  In doing so, we further conclude, as a matter of law, that the brothers own the Farm Account through statutory survivorship.  The MPAA grants a presumption in favor of survivorship, and the sisters have not demonstrated clear and

- 23 -

convincing evidence that Father intended the Farm Account to be divided equally among the siblings and not include a right of survivorship. 20 Pa.C.S. § 6304; *Novosielski*, 992 A.2d 89. Accordingly, we reverse the orphans' court January 19, 2017 order.

Order reversed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/6/2017